In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 05-4070, 05-4071 & 05-4072

BRENDA JACKSON, SHERRI LISIECKI,
PATRICIA BIRCHELL-SIELAFF, and
ESTATE OF LINDA R. SCHULTZ,

*Plaintiffs-Appellants*,

*v.*

COUNTY OF RACINE,

*Defendant-Appellee.*

Appeals from the United States District Court
for the Eastern District of Wisconsin.
Nos. 02-C-936, 02-C-1262, 02-C-1263—
**Aaron E. Goodstein**, *Magistrate Judge.*

ARGUED FEBRUARY 23, 2006—DECIDED JANUARY 25, 2007

Before EASTERBROOK, *Chief Judge,* and RIPPLE and
WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Brenda Jackson, Sherri Lisiecki,
Patricia Birchell-Sielaff, and Linda Schultz worked at
the Child Support Division (CSD) of Racine County,
Wisconsin. While there, they assert, they were subjected
to constant sexual harassment from CSD's Division
Manager, Robert Larsen. The first three women filed
lawsuits based on Title VII of the Civil Rights Act of 1964,
42 U.S.C. §§ 2000e *et seq.*; the Estate of Linda R. Schultz
did likewise. The parties agreed to consolidate the cases

for purposes of discovery and to permit the magistrate judge to handle them, see 28 U.S.C. § 636(c). After evaluating the parties' submissions on the County's motion for summary judgment, the district court concluded that the conduct in question was not serious or pervasive enough to create an actionable hostile work environment; it did not reach the County's affirmative defense under *Burlington Industries Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). We conclude that, although genuine issues of fact are present with respect to the existence of sexual harassment, the County is entitled to prevail on its affirmative defense. We therefore affirm.

# I

We present the facts in the light most favorable to the plaintiffs. Larsen was the Division Manager of CSD from approximately October 1, 2000, to June 26, 2001. Jackson and Birchell-Sielaff were supervisors; Schultz was an assistant supervisor, and Lisiecki worked under Jackson's supervision. The workforce as a whole at CSD was approximately 85% female. Racine County had in place a policy prohibiting sexual harassment, which read as follows in pertinent part:

> (1) It is illegal and against the policies of the county for any employee, male or female, to sexually harass another employee by:
>
>> a.  Making unwelcome sexual advances, or
>>
>> b.  Making requests for sexual favors or other verbal or physical conduct of a sexual nature, a condition of employment, or
>>
>> c.  Making submission to or rejection of such conduct the basis for employment decisions affecting the employee, or

> d. Creating an intimidating, hostile or offensive working environment by such conduct.

> Examples of prohibited conduct include, but are not limited to, loud or sexually suggestive comments; sexual flirtations, touching, advances, or propositions; off-color language or jokes of a sexual nature; slurs and other verbal, graphic or physical conduct relating to an individual's gender; or any display of sexually explicit pictures, greeting cards, articles, books, magazines, photos or cartoons.

The policy also established an anti-harassment committee and set up procedures that any employee who felt harassed could use. It concluded by providing that it was to be communicated to employees annually and that it was to be posted on appropriate bulletin boards throughout the county.

Within weeks of Larsen's appointment to the position of Director, he began to engage in inappropriate conduct toward the female employees in the CSD; he did not engage in similar behavior toward the male employees. Some of this behavior was rude or intimidating. For example, Larsen would slam a door in a threatening way to demonstrate his anger with Birchell-Sielaff, Schultz, or Jackson. He also interrupted meetings that they were holding with their subordinates, publicly chastising them and yelling at them. He forced supervisors to work long hours and to maintain heavy work loads, leaving them exhausted.

Some of his behavior was more overtly sexual. We begin with Jackson. Once, when she asked for Larsen's help in unjamming a stapler, he commented that she had "a great set of boobs." Indeed, Larsen not only made remarks like this on a daily basis; he also constantly sent sexual jokes to Jackson as well as others in the office. On one occasion, Jackson told Larsen that she could not

paint because she had carpal tunnel syndrome. Larsen responded, "Can you do this?" and proceeded to simulate masturbation, stating, "Because that's the only important one." In addition, Larsen frequently made comments to Jackson about his sex life with his wife. In a more juvenile vein, he often sidled up to women and asked "Can I give you a kiss," while offering a chocolate Hershey's kiss to them. Nor did he stop with that. On two occasions he wet his finger and stuck it in Jackson's ear while blowing in her ear. On one occasion, when Jackson was trying to apologize to Larsen for returning late from lunch, he placed his arm around her and kissed her on the lips.

Lisiecki was subjected to similarly offensive behavior. Larsen touched her constantly, on her neck, shoulders, hair, and arms. As with Jackson, on several occasions Larsen stuck a wet finger in her ear and blew on it. He also made inappropriate comments about each woman's clothing, suggesting on a hot day to Lisiecki that she could come to work in her bikini. He told her once that he would love to be under her desk. Finally, Lisiecki claims that Larsen told her that she might be promoted, implying that the promotion would occur if he could "take liberties with her." When she refused his crude invitation, he no longer discussed her promotion. In fact, Larsen had no authority to create a management position for Lisiecki.

To Birchell-Sielaff, Larsen made constant remarks about the way various women looked in their clothing, including remarks about their breasts. He also gave out the Hershey's kisses during meetings that she conducted. He repeatedly told her about his sexual interest in various female employees, as well as his exploits with his wife.

Schultz, who passed away before this suit was filed, was also the target of Larsen's unwanted attentions, includ-

ing the unwanted Hershey's kisses, jokes, emails, comments about her appearance in certain clothing, and leering. If Larsen saw her eating her morning breakfast of a banana, he commented that he liked watching her eat.

Within a month of Larsen's assumption of his job, Birchell-Sielaff complained to Marta Kultgen, Racine County's Human Resource Manager since 2000, about Larsen's "kiss" routine and how unpleasant it was to work with Larsen. Kultgen took no action in response to this complaint other than to maintain contact with Birchell-Sielaff. Between October 2000 and February 2001, Birchell-Sielaff complained frequently about Larsen, but she did not indicate that she was concerned about sexual harassment.

The first time that Kultgen was alerted to a problem with sexual harassment came in a February 14, 2001, telephone call from Birchell-Sielaff, in which Birchell-Sielaff reported that "some" CSD employees had complained about Larsen's inappropriate sexual comments. Kultgen replied that she would need to look into this, as it might involve a violation of the County's anti-harassment policy. Although Birchell-Sielaff was initially reluctant to provide the name of the person who had complained, she eventually gave Kultgen one name and claimed that she did not know if anyone else was experiencing similar problems.

Kultgen followed up with the employee Birchell-Sielaff had identified, who confirmed that Larsen had made an unwelcome sexual remark to the effect that "now you can go home and tell your husband you went up and down with Bob in the office." The employee told Kultgen that she did not want to file an internal complaint of sexual harassment.

On February 15, Birchell-Sielaff contacted Kultgen again and gave her Lisiecki and Jackson's names as

additional possible victims of Larsen's sexual harassment. Again, Kultgen acted promptly. She contacted Jackson, who confirmed that Larsen had indeed been engaging in the behaviors detailed above. Kultgen emphasized to Jackson how important it was to report this kind of behavior and asked whether Jackson wanted to file a formal complaint. Jackson declined, saying that Larsen's behavior had improved since she told him that his conduct was unwelcome. Kultgen also contacted Lisiecki, but the latter declined to provide any details about Larsen's behavior toward her. She did admit that there had been an unwelcome touching at one point and that Larsen had promised her a promotion that had not materialized after she refused his advances. Kultgen explained that, regardless of Larsen's statements or behavior, there was no vacant management position for which Lisiecki was qualified and that Larsen lacked the authority to make a promotion on his own. Like the others, Lisiecki did not want to file a formal complaint. Kultgen also contacted several other people.

On February 23, 2001, the Anti-Harassment Committee met. The members included Kultgen, Matthew McVey (an assistant corporation counsel), and Connie Mallwitz (a lieutenant with the Sheriff's Department). In light of the lack of any formal complaints before it, the committee concluded that there was nothing at that point for it to do, apart from counseling Larsen about sexually inappropriate behavior. The committee also sent letters to the women Kultgen had met, in order to confirm the fact that they did not wish to complain. Those letters spelled out the procedures that should be followed if they wished to report any further allegations of sexual harassment.

A few months later, on April 27, 2001, the County held a training session about the sexual harassment policy. At the end of the session, Jackson and Birchell-Sielaff spoke

with the session coordinator, Alice Oliver, and told Oliver that they believed that Larsen had engaged in prohibited behavior. Oliver passed this word along to Kultgen, who followed up with emails to the same women she had contacted earlier, asking whether anything further had happened. Two did not respond; Lisiecki answered "everything is fine, thanks for checking!", and the fourth woman also responded "all is well."

Two weeks later, Corporation Counsel Mark Janiuk met with Jackson, Schultz, and Birchell-Sielaff to discuss management issues about Larsen. What he heard prompted him to contact Kultgen with the details; the two of them decided that the Anti-Harassment Committee had to convene to conduct a full investigation of Larsen's management of the CSD. Within days, it had done so, and the County placed Larsen on administrative leave. The Committee took statements from 21 employees in the course of its investigation. It concluded that Larsen's employment should be terminated based on his inappropriate conduct as manager of the CSD. Upon review of that report, County Executive Jean Jacobsen decided that demotion, rather than termination, was an adequate punishment. With the demotion came a reduction in pay, a lesser title with fewer responsibilities, and banishment from the CSD. As far as the record shows, no further allegations of sexual misconduct were lodged against him.

## II

As we noted earlier, based on all of this the district court concluded that the acts to which the plaintiffs were subjected were not severe or pervasive enough to amount to sexual harassment, and it thus granted the County's motion for summary judgment. We review that decision *de novo*, *Koszola v. Bd. of Educ. of City of Chicago*,

385 F.3d 1104, 1107 (7th Cir. 2004); summary judgment is proper only if there is no disputed issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1057 (7th Cir. 2000).

A

We consider first whether the ground on which the district court relied—the absence of disputed facts on the question whether sexual harassment existed with respect to any of the plaintiffs—is sustainable. One of the ways in which Title VII's prohibition against sex discrimination in the terms and conditions of employment may be violated is through sexual harassment that is either severe or pervasive enough to create an abusive working environment. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Indeed, more than 20 years ago, the Supreme Court recognized that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). In order to establish a *prima facie* case under this theory, a plaintiff must show, among other things, that she has been subjected to "behavior so objectively offensive as to alter the conditions of [her] employment." *Oncale,* 523 U.S. at 81 (internal quotations omitted). In addition, she must show the link between this treatment and her sex: as the Court stressed in *Oncale*, "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at '*discriminat[ion]* . . . because of . . . sex.'" *Id.* at 80 (emphasis in original). In order to decide whether a plaintiff's showing at the summary judgment stage meets this standard, the court must examine all the circumstances, including the "fre-

quency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Moser v. Indiana Dept. of Corr.*, 406 F.3d 895, 902 (7th Cir. 2005) (quoting *Harris*, 510 U.S. at 23). There is both an objective and a subjective dimension to these inquiries. *Harris,* 510 U.S. at 21-22.

It is important to recall that harassing conduct does not need to be both severe *and* pervasive. *Cerros v. Steel Tech., Inc. (Cerros II)*, 398 F.3d 944, 950 (7th Cir. 2005). One instance of conduct that is sufficiently severe may be enough. See *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999). Conversely, conduct that is not particularly severe but that is an incessant part of the workplace environment may, in the end, be pervasive enough and corrosive enough that it meets the standard for liability. Ultimately, as we noted in *Smith,* "The conduct must . . . be so severe or pervasive as to alter the terms or conditions of the employment relationship." *Id.* at 533 (citing *Ellerth*, 524 U.S. at 752; *Harris*, 510 U.S. at 21; and *Meritor*, 477 U.S. at 64).

What concerns us about the district court's disposition of all four cases is its characterization of Larsen's inappropriate touching and sexual comments as "isolated incidents," when the plaintiffs' deposition testimony asserts that he engaged in this type of behavior on a daily basis. The County supports the district court's decision with a reference to *Lucas v. Chicago Transit Auth.*, 367 F.3d 714 (7th Cir. 2004), but *Lucas* is not as helpful as it thinks. In that case, the plaintiff, who alleged a racially hostile environment, generally complained that African-Americans were treated more harshly and were written up for reasons that whites were not, without providing any specific examples. Not surpris-

ingly, this court held that the plaintiff needed something more concrete before his case could go forward. *Id.* at 726. But Jackson and Lisiecki, at least, provided the necessary specifics to support their charges against Larsen. They testified that he regularly touched them on the hair and the back of the neck whenever he had the occasion to interact with them. Jackson's testimony about a number of Larsen's offensive actions (simulating masturbation, sticking his finger in her ear, kissing her on the lips), coupled with her testimony about his day-to-day behavior, could, if believed by a trier of fact, show pervasive harassing conduct. Lisiecki too complained of constant unwelcome touching, offensive sexually-based remarks about her appearance and that of other women at the workplace, and a clumsy effort to induce her to succumb to sexual relations in exchange for a promotion that, in reality, he could not deliver. If believed, this too could support a finding of the kind of abusive behavior directed against her because of her sex that alters the terms and conditions of her employment.

The testimony supporting Birchell-Sielaff and especially Schultz (now deceased) is not as strong, but taken as a whole it might also suffice to show that they suffered from discrimination in the form of sexual harassment in the workplace. Rather than rule definitively on that point, however, we prefer to leave this question unresolved. Even if their evidence supported a finding that they experienced harassment at the CSD, it would still be necessary to consider the County's *Ellerth/Faragher* defense, to which we turn in a moment.

Before concluding, however, we note that all parties in this case seem to think that a working environment must be "hellish" before a Title VII suit can succeed. The Supreme Court's decision in *Harris* establishes that something short of the Ninth Ring may violate the statute:

> Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality. The appalling conduct alleged in *Meritor*, and the reference in that case to environments "so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers," *id.* at 66, merely present some especially egregious examples of harassment. They do not mark the boundary of what is actionable.

510 U.S. at 22 (internal citations omitted). We trust that in the future counsel will avoid the use of a single, overwrought word like "hellish" to describe the workplace and focus on the question whether a protected group is experiencing abuse in the workplace, on account of their protected characteristic, to the detriment of their job performance or advancement.

## B

Even if each of the four plaintiffs here experienced unlawful sexual harassment at the workplace, there still must be a basis for employer liability. In *Ellerth* and *Faragher*, the Supreme Court established the rules for employer liability when the harassing individual is a supervisor, as Larsen was. It distinguished between two

situations: those in which the supervisor's harassment resulted in "a tangible employment action, such as discharge, demotion, or undesirable reassignment," see *Hill v. American General Finance, Inc.*, 218 F.3d 639, 643 (7th Cir. 2000), and those in which it did not. In the former situation, the employer's vicarious liability is strict, in the sense that no defense is available once the other elements of the case have been proven. If, however, the harassment is not accompanied by, or does not result in, any tangible employment action, then the employer is entitled to defeat the plaintiff's case by showing "a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765.

Before this court, the parties dispute whether Larsen took any tangible employment action such that the County may not invoke the affirmative defense. The only one of the four plaintiffs who seriously asserts that such an action was taken is Lisiecki; we see nothing that would deprive the County of the defense in the cases brought by Jackson, Birchell-Sielaff, and Schultz. Even in Lisiecki's case, we conclude that the record does not create a genuine issue of fact about the alleged lost promotion. Of course, a failure to promote would qualify as an adverse employment action, if that is what we had. See *Volovsek v. Wisconsin Dept. of Agr., Trade and Consumer Protection*, 344 F.3d 680, 688 (7th Cir. 2003). But there is no evidence that Lisiecki was denied a promotion for a job that was actually available and for which she was qualified. See *Jordan v. City of Gary*, 396 F.3d 825, 833 (7th Cir. 2005). To the contrary, the only evidence of availability comes from Kultgen, and she testified that there was no such job opening. Larsen was vague about the position he was

promising to Lisiecki, and so it is impossible to know whether she would have qualified for it. Moreover, Lisiecki has no response to the County's evidence that Larsen had no authority to create the position. It is important to distinguish between the real loss of a promotion (a tangible action) and the disappointment that follows when it turns out that there is no tangible benefit available at all and that the supervisor has been lying in order to win sexual favors. Lisiecki's testimony could establish the latter fact, but that is not what *Ellerth* requires for strict liability.

We turn, therefore, to the affirmative defense. The County's first task is to show that it took reasonable care to prevent or correct any harassing behavior. Although the plaintiffs argue that it failed to take steps to prevent harassment and that it had no sexual harassment policy, the record shows that the contrary is true. At the time these incidents took place, the County had a comprehensive anti-harassment policy in effect that plainly covered sexual harassment. The policy was posted in every department, including CSD. Marta Kultgen, the manager of the Human Resources Department, responded promptly to every complaint that reached her.

Nor could any trier of fact find that the County did not act reasonably to correct harassing behavior that was brought to its attention. Neither the County, nor the Anti-Harassment Committee, nor Kultgen can be criticized for attempting to work with complainants who did not wish to lodge formal complaints, at least over the short time between mid-February 2001 and early May 2001, when the Committee launched its comprehensive investigation. After all, when Kultgen followed up at the end of April with the four original complainants (including Jackson and Lisiecki), she received either no response or an assurance that all was well. The investigation was thorough and resulted in a significant disciplinary measure for Larsen:

demotion and all of its attendant disadvantages. Although the plaintiffs argue in their reply brief that any action short of firing Larsen was insufficient, that position misses the goal of anti-harassment law. We have said that "[a]n employer's response to alleged instances of employee harassment must be reasonably calculated to *prevent further harassment* under the particular facts and circumstances of the case at the time the allegations are made." *McKenzie v. Ill. Dept. of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996) (emphasis added). The steps that the County took against Larsen achieved this goal.

The County also has the burden of showing that the plaintiffs unreasonably failed to take advantage of any preventive or corrective opportunities that it provided. One sign of unreasonable behavior on the plaintiffs' part is undue delay in calling the problem to the employer's attention. See, *e.g.*, *Gawley v. Indiana Univ.*, 276 F.3d 301 (7th Cir. 2001) (holding that defendant was entitled to summary judgment with respect to the affirmative defense where plaintiff waited seven months before reporting sexual harassment). In *Ellerth*, the Court wrote:

> [W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

524 U.S. at 765.

It was not until four months after Larsen became manager that any of the plaintiffs first complained to Kultgen about his behavior. Birchell-Sielaff admitted in her deposition that although she talked to Kultgen often and generally complained about Larsen's job performance and lack of attention to his duties, it was not until later

that she revealed the inappropriate exchanges between Larsen and another co-worker (not a plaintiff here). Birchell-Sielaff also admitted that as soon as she told Kultgen about those comments, Kultgen informed her that this was sexual harassment, that she was going to have to report it and talk to the co-worker, and that she wanted to know about any other such instances. In response to the last inquiry, Birchell-Sielaff said, "I wouldn't know." Jackson conceded in her deposition that she was aware that there was a sexual harassment policy in place during the time she worked in the CSD, but she waited for a long time before invoking it. It was not until May 2001 that three of the plaintiffs indicated that they wanted a full investigation, and the record shows that the Anti-Harassment Committee immediately complied.

We conclude that this is enough to require summary judgment in the County's favor based on the *Ellerth/Faragher* affirmative defense, both for the plaintiffs who unequivocally succeeded in raising material issues of fact on the question of harassment and for those whose initial showing we have granted for the sake of argument.

We therefore AFFIRM the judgment of the district court.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*
