In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-3834

CATHERINE A. MOBLEY,

*Plaintiff-Appellant,*

*v.*

ALLSTATE INSURANCE COMPANY
a/k/a ALLSTATE PROPERTY AND
CASUALTY INSURANCE COMPANY,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:04-cv-1430-SEB-VSS—**Sarah Evans Barker**, *Judge.*

———————

ARGUED NOVEMBER 28, 2007—DECIDED JULY 8, 2008

———————

Before EASTERBROOK, *Chief Judge,* and FLAUM and WOOD, *Circuit Judges.*

FLAUM, *Circuit Judge.* Plaintiff Catherine A. Mobley worked for Allstate Insurance ("Allstate") for sixteen years before being laid off with 31 other employees in October 2003 as part of a reduction in force ("RIF"). In July 2001, Mobley had begun having problems concentrating and staying awake at work, due to what was ultimately diagnosed as essential tremor and nocturnal myoclonus. From fall 2002 until April 2003, Mobley

wrangled with her supervisors over workplace accommodations for her conditions. In May 2003, Allstate permitted Mobley to regularly work in a private room rather than a cubicle. Although Mobley's earlier, temporary placement in this private room had improved her work performance, Mobley's performance level never reached the "meets" level after May 2003, causing her name to be included on the RIF in October of that year. Mobley subsequently brought suit against Allstate under the Americans with Disabilities Act ("ADA"), bringing claims for failure to accommodate her disability, discriminatory termination, and unlawful retaliation. The district court granted summary judgment in favor of Allstate on all claims, which Mobley now appeals. For the reasons discussed below, we affirm.

## I. Background

Mobley began working for Allstate Insurance in 1987 and during the period of time relevant to this suit, July 2001 through October 2003, Mobley held the position of Staff Claims Service Adjuster. In this role, Mobley's immediate supervisor was Nancy Brechbuhl. Brechbuhl, in turn, was directly supervised by Alexandra Balatsoukas, the manager of the Indianapolis Allstate facility where Mobley worked.

Prior to her annual review in 2002, all of Mobley's performance evaluations had been positive. Allstate's review system for Claims Adjusters centered upon numeric goals regarding the quality and quantity of their work. If a Claims Adjuster is meeting these goals, they are rated as "Meets" or "Exceeds." If they fall below a "meets" level, they are then placed on a performance

improvement plan and given "Requires Improvement" ("RI") status. Once on RI status, an employee is then reviewed at the 30, 60, and 90 day marks to determine if they have improved to a "meets" level. If, after this time, a Claims Adjuster has not reached a "meets" level, they are then placed on "Job in Jeopardy" ("JIJ") status. Typically, if a Claims Adjuster cannot improve to a "meets" level after another 90 days, she is terminated. For those Claims Adjusters taken off RI or JIJ status for reaching a "meets" level, any fall under a "meets" level over the next twelve months generally results in immediate JIJ status.

From March 2001 to July 2001, Mobley was away from work on an approved disability leave for depression. During this leave, Mobley sought treatment after she began to experience tremors and involuntary muscle movements, and was diagnosed with essential tremor. Upon returning to work in July 2001, Mobley experienced difficulty with her concentration and focus, as well as staying awake while at the office. At the same time, Mobley was also assigned to work on approximately 100 uninsured and underinsured motorist ("UI/UIM") claims that, up to that time, had not been worked on properly and were more complicated than those involving insured motorists.

At her next annual performance evaluation, in March 2002, Mobley was informed that she was "not meeting the accountabilities of your position," which Mobley disputed. In July 2002, Mobley was then formally placed on RI status. In response, Mobley explained that her health condition was affecting her concentration and memory, and that she was undergoing tests in order to diagnose the problem. That same month, Mobley under-

went a sleep study, the results of which she passed along to Brechbuhl.

In early fall 2002, Mobley asked Brechbuhl if she could use the "huddle room," which was a small conference room, on an as needed basis to help with her concentration and focus. Brechbuhl permitted Mobley to do so, so long as she asked Brechbuhl for permission on each occasion. That fall, Mobley also requested that Brechbuhl let her work from home one or two days a week to help her productivity, and allow her to work solely on bodily injury ("BI") evaluations in order to limit her focus and increase her performance. Brechbuhl denied both of these requests. Mobley points out, however, that Allstate permitted one of her non-disabled co-workers to work from home several afternoons a week so she could watch her son's baseball games, and later assigned another, lower rated employee to work exclusively on the BI files.

On October 30, 2002, Mobley responded to her RI status review, which reported that she had not returned to a "meets" performance rating. In her response, Mobley noted that she had been diagnosed with essential tremor, myoclonus, and narcolepsy, and was attaching medical documentation to that effect. She then noted that she was on medication and wrote, "I have felt much better the last two weeks. I believe that once I am able to work through the backlog that has accumulated, I will return to the Meets/Exceeds employee I have been for the last 15 years." The attached medical records were then faxed to Allstate's human resources department on November 11, 2002.

Mobley then had a follow-up meeting with Balatsoukas on November 18, 2002 regarding her RI status. In this meeting, Mobley told Balatsoukas that using the huddle

room had been beneficial and that she thought it would also be helpful if she could work at home one day a week and focus on BI evaluations. Balatsoukas denied these requests, allegedly telling Mobley that she would do the same work as everyone else at the company, or she would be terminated. A week or two later, however, Brechbuhl informed Mobley that Balatsoukas had decided to permit Mobley to use the huddle room again. According to Mobley, Brechbuhl conveyed that Balatsoukas was letting Mobley use the huddle room to prove that she was not disabled and that this accommodation would have no impact on her performance. Using the huddle room, however, Mobley was able to bring her performance level up to a "meets" status by the end of January 2003. As a result, in early March, Balatsoukas and Brechbuhl had a meeting with Mobley to confirm her improved status. At this meeting, Mobley was told that because of her improvement, she was being moved out of the huddle room. Mobley was also informed that although she would keep the UI/UIM files she already had, in the future she would only be assigned BI claims.

Around the same time, Mobley also received further medical information. In February 2003, Mobley received a note from her physician requesting that Mobley be provided with an alternate schedule, where she would take Wednesdays off, but work ten hour days the other four days of the work week, in order to provide her with extra time to sleep. She passed this information along to Allstate sometime in late February or early March as part of FMLA paperwork for her being gone from work from February 10 to 14.

On March 21, 2003, Mobley met with Balatsoukas and Brechbuhl to discuss her requested change to her

schedule. Balatsoukas informed Mobley that this request had been denied because her being out of the office on Wednesdays would cause difficulties in covering her phone calls. Balatsoukas did, however, suggest that Mobley's schedule be pushed back to 9:00 - 5:30, in order to give her more time to sleep in the morning, although Mobley expressed that this would not help given the fact that she would probably have to come in early and stay late anyway to complete her work.

Following this meeting, Mobley contacted Allstate's Resolution Tracking System sometime around March 25, and was put in contact with Human Resources Division Manager Sybil Brenner. Through this contact, Mobley provided Allstate with additional information it requested from her physician. Mobley's physician indicated on a form that Mobley suffered from lifelong medical conditions, and in response to being asked "[w]hat specific accommodations are needed," her physician wrote:

— being in room by herself—helps her concentrate.

— working Monday & Tuesday for 10 hrs, have Wed. off, work Thursday & Friday for 10 hrs.

Mobley, at least earlier in March, had viewed these proposals as alternative accommodations.

Around this same time, despite Mobley's being assigned the easier BI files, without the use of the huddle room, her performance rating again dipped below "meets" status, and she was told she would be reviewed again in June. In late April and early May, additional accommodations were made for Mobley. On April 28, Brenner from human resources conveyed to Balatsoukas in an email that it was important to accommodate Mobley, and that accordingly, she was to be permitted to use the huddle room again,

seeing as it had previously been successful in improving her performance. Mobley began using the huddle room again in the first week of May, and around the same time, at least eighteen of Mobley's files were transferred to another employee in order to alleviate her workload. Although Mobley's schedule also continued to be pushed back a half hour to give her time to sleep in, she complained that Balatsoukas would not permit her to work past 5:30 p.m., which prevented her from getting all her needed work done.

By the summer, Mobley was still not performing at a "meets" level, and in July, in the hopes of improving her performance, she began taking work home with her. By August, however, Mobley's performance still had not improved to a "meets" level, and on August 26, 2003 she was provided with notification that she had been placed back on RI status, even though Allstate could have placed her directly in JIJ status. The next month, in September, Brechbuhl informed Mobley that she was coming close to meeting Allstate's expectations and would likely be moved off RI status.

Mobley never reached "meets" status, however, and instead, on October 23, 2003, was one of thirty-two employees terminated as part of Allstate's RIF. As of early 2003, Balatsoukas knew that the RIF was a possibility, and employees throughout the department, including Mobley, were aware by mid-summer that such a reduction was likely. Brenner, in human resources, was initially responsible for putting together the RIF package. The criteria used for putting together the package were stated as including those on RI status, business need, and length of service, although service date was not ultimately used. In September or October, Brenner pulled a

list of employees on RI status as of the end of August. Although Mobley argues that there are discrepancies between this list and those who were terminated and on RI status, Mobley was included on this list and let go by Allstate.

Mobley brought suit against Allstate on August 31, 2004, asserting claims under the ADA and the Age Discrimination in Employment Act ("ADEA"). Allstate filed a motion for summary judgment on January 31, 2006. Mobley, in her response to Allstate's motion for summary judgment, conceded her ADEA claim. The district court then issued its order and judgment on September 22, 2006, granting summary judgment for Allstate with respect to Mobley's remaining claims of failure to accommodate, discriminatory termination, and unlawful retaliation under the ADA. Mobley now appeals these claims.

## II.  Discussion

### A.  Standard of Review

This Court reviews a district court's grant of a motion for summary judgment *de novo*. *Jackson v. County of Racine,* 474 F.3d 493, 498 (7th Cir. 2007). In doing so, all facts and reasonable inferences are construed in the light most favorable to the nonmovant party, Mobley. *Lawson v. CSX Transp., Inc.,* 245 F.3d 916, 922 (7th Cir. 2001). A district court's grant of summary judgment is to be affirmed if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

**B.   Failure to Accommodate**

Mobley's first claim is that Allstate failed to accommodate her disability. Under the ADA, a failure to make reasonable accommodations for a known disability constitutes unlawful discrimination. 42 U.S.C. §§ 12112(b)(5)(A), 12112(a). In order to prevail on this claim, Mobley must show: "(1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005) (citing *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001)). In conjunction with this third element, the "ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation." *Id.* (quoting *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998)).

Turning to the first element of a failure to accommodate claim, we find that Mobley is a "qualified individual with a disability." In order to satisfy this element, Mobley must show that she is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that [she] holds or desires." 42 U.S.C. § 12111(8); *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 659-60 (7th Cir. 2005). This first element thus contains two parts—showing that Mobley's medical conditions rendered her disabled, and that she was able to still perform at a "meets" level. Allstate does not contest that Mobley had a disability as of April 2003, when Allstate's human resources department received further documentation from Mobley's physician. Allstate argues though, that once Mobley was provided with an array of accommodations in late

April or early May 2003, she was still unable to reach "meets" status, and thus failed to show that she could perform one of the essential requirements of her position. Allstate, however, in looking only at Mobley's performance after April 2003, fails to recognize that for approximately two to three months, from January to early March 2003, Mobley was able to perform at a "meets" level when she was allowed to work in the huddle room. Although arguably, at that time period, it was not known that Mobley's condition was permanent or long-term, as is required to constitute a "disability," *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 198 (2002) ("The impairment's impact must also be permanent or long-term."), there is no indication that Mobley's underlying condition worsened between January and April 2003, only that the "chronic," "indefinite" and "lifelong" nature of her condition was not documented to Allstate when she achieved "meets" status with this accommodation. Because the underlying condition itself did not change, we find that Mobley's achievement of a "meets" status while using the huddle room in early 2003 satisfies this first element.

The discussion above regarding Mobley's documentation of her condition to Allstate is relevant in considering the second factor, Allstate's awareness of Mobley's disability. According to Allstate, Mobley's failure to accommodate claim should only pertain to Mobley's work environment after April 2003, since Allstate alleges that as late as March 2003, when Mobley was reassigned to her workstation from the huddle room, all parties were under the understanding that Mobley's medical condition and its impact on her work performance were temporary. Determining when Allstate became aware of Mobley's disability ties into the third factor, since the interactive process is triggered upon the employee's notification to

the employer of their condition. *Sears, Roebuck & Co.*, 417 F.3d at 803-04. It is not necessary for this Court in this case, however, to determine whether the evidence is sufficient to support a finding that the interactive process was triggered prior to April 2003, since, as we will discuss, we find that Allstate did eventually reasonably accommodate Mobley's disability. Although it was an admittedly laborious process for Mobley to obtain the accommodation she finally received in late April or early May 2003, the fact that Allstate may have failed to engage in an interactive process prior to that time is by itself insufficient to establish a failure to accommodate claim when, in the end, Mobley was provided with a reasonable accommodation. *Rehling v. City of Chicago,* 207 F.3d 1009, 1016 (7th Cir. 2000) ("we hold that a plaintiff must allege that the employer's failure to engage in an interactive process resulted in a failure to identify an appropriate accommodation for the qualified individual"); *Sieberns v. Wal-Mart Stores*, 125 F.3d 1019, 1023 (7th Cir. 1997) ("The interactive process the ADA foresees is not an end in itself; rather it is a means for determining what reasonable accommodations are available to allow a disabled individual to perform the essential job functions of the position sought.").

We find that in this case, Allstate did reasonably accommodate Mobley's disability. The ADA includes a long, non-exclusive list of what "reasonable accommodations" may include, 42 U.S.C. § 12111(9)[1], although an employer is

---

[1] This includes:

   (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(continued...)

not required to make accommodations that "would impose an undue hardship" upon the employer. 42 U.S.C. § 12112(b)(5)(A). Mobley's argument focuses on what accommodations were not made by Allstate despite her requests, contending that other individuals were provided with these alternative arrangements and that providing such accommodations to Mobley would not constitute an "undue hardship." However, even if the accommodations Mobley requested—working from home; exclusively working on BI files; and switching to four, ten hour days with Wednesdays off—did not impose an "undue hardship" on Allstate, that did not obligate Allstate to grant these accommodations. Rather, "[a]n employer is not obligated to provide an employee the accommodation [s]he requests or prefers, the employer need only provide some reasonable accommodation." *Gile v. United Airlines*, 95 F.3d 492, 499 (7th Cir. 1996); *Sears, Roebuck & Co.*, 417 F.3d at 802. Therefore, Allstate was not required to provide Mobley with all her requested accommodations, but did, at a minimum, have "to provide an accommodation that effectively accommodate[d] [Mobley's] limitations." *Sears, Roebuck & Co.*, 417 F.3d at 802.

---

[1] (...continued)

    (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

Allstate met its obligation in this case to effectively accommodate Mobley's limitations in the workplace. From July 2001, when Mobley's condition began, to October 2003, when she was terminated, the one accommodation that had successfully allowed Mobley to bring her performance level to a "meets" status was her use of the huddle room from late November or early December 2002 until early March 2003. The use of the huddle room was also one of two alternative accommodations specifically recommended by Mobley's physician. Although prior to April 2003, Mobley's use of the huddle room had been sporadic, from early May up until the time she was terminated, Mobley was permitted to use the huddle room on a regular basis. Therefore, despite the other accommodation requests Mobley had made, Allstate provided Mobley with the only accommodation proven to "effectively accommodate[ ] [her] limitations." In addition to using the huddle room, Mobley also, from May 2003 on, was provided with other accommodations, including permission to shift her schedule back a half hour; reassignment of at least 18 files to another worker; and being assigned only BI files.

Although Mobley was ultimately permitted to use the huddle room, she claims that when this occurred, her accommodations were still not reasonable, since Balatsoukas's efforts to prevent her from working at the office past 5:30 p.m. prevented her from getting her work done and meeting Allstate's performance expectations. This argument, however, is unavailing. Even accepting that Mobley's forty hours at the office were insufficient for her to complete all her work, Balatsoukas's reluctance to allow her to work longer hours at the office does not make Allstate's accommodations unreasonable. There is no evidence in the record that Mobley was in any way prevented from taking her work home

with her if necessary; indeed, the fact that she began doing so in July 2003 shows that this was not the case. Furthermore, there is no evidence that it was more difficult for Mobley to complete her work when at home. To the contrary, Mobley specifically requested that she be permitted to work from home and testified to the fact that she was able to work productively in that environment.

As an additional matter, we note that Mobley's claim that Allstate failed to reasonably accommodate her disability also fails because she has failed to meet her burden of showing that her other requests did in fact constitute reasonable accommodations. *Mays v. Principi*, 301 F.3d 866, 871 (7th Cir. 2002) ("the burden of showing that a reasonable accommodation existed remains on the employee"). Again, the only accommodation that has been proven to effectively remedy Mobley's limitations is the use of the huddle room. With respect to Mobley's request to work four, ten hour days and take Wednesdays off, Mobley offered no evidence that this would effectively accommodate her disability, and she in fact testified that this proposal was viewed as an alternative to her being allowed to use the huddle room. Additionally, with respect to Mobley's request in fall 2002 to be assigned BI files, by March 2003 this accommodation had been provided, but Mobley was still unable to achieve "meets" status. The final request made by Mobley that was not granted by Allstate was that she be permitted to work from home one or two days each week. Here too, Mobley has failed to show that this in fact would have effectively accommodated her disability, and additionally, we note that as a general matter, working at home is not a reasonable accommodation. *Rauen v. United States Tobacco Mfg.*, 319 F.3d 891, 896 (7th Cir. 2003) ("a home office is

rarely a reasonable accommodation") (citing *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 544-45 (7th Cir. 1995)). Accordingly, despite wrangling between Mobley and Balatsoukas regarding use of the huddle room prior to Mobley's conversation with human resources and filing of additional medical documentation in March and April 2003, Allstate ultimately reasonably accommodated Mobley's disability by permitting her to use the huddle room, the one accommodation that had proven to be effective in allowing Mobley to achieve "meets" status. The fact that after April 2003, Mobley was unable to replicate her earlier rise to "meets" status does not render Allstate liable when the accommodation provided had proven effective in the past and Mobley failed to raise any concern after April 2003 that additional accommodations were needed.

### C.  Discriminatory Termination

Mobley's next claim is that Allstate acted discriminatorily when it terminated her in October 2003 as part of its RIF. Mobley attempts to prove this claim under the indirect, burden-shifting method of proof established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), arguing that discrepancies in the RIF package put together by Brenner show that discriminatory intent motivated Allstate's decision to terminate Mobley. This claim fails, however, because Mobley is unable to meet one of the elements of the prima facie case.

In order to establish a prima facie case of discrimination under the indirect method of proof, Mobley must show: "(1) [s]he is disabled within the meaning of the ADA; (2) [s]he was meeting h[er] employer's legitimate em-

ployment expectations; (3) [s]he suffered an adverse employment action; and (4) similarly situated employees received more favorable treatment." *Rooney v. Koch Air,* 410 F.3d 376, 380-81 (7th Cir. 2005). Mobley argues at length regarding discrepancies in the RIF package that allegedly reveal that other employees received favorable treatment, but has failed to offer any evidence with respect to the second element—that she was meeting Allstate's employment expectations when she was terminated. *See Burks v. Wisconsin Dept. Of Transp.,* 464 F.3d 744, 753 (7th Cir. 2006) (in race discrimination case involving the plaintiff's termination, finding that, "[a]lthough [the plaintiff] may have been performing adequately at the time of her positive evaluation, the critical inquiry is her 'performance at *the time of* [her termination]'") (quoting *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 901 (7th Cir. 2005)) (emphasis in original); *see also Squibb v. Mem. Med. Ctr.,* 497 F.3d 775, 788 (7th Cir. 2007) (in ADA retaliation claim under the indirect method, stating "we must examine [the plaintiff's] performance at the time of the challenged adverse actions"); *see also Timmons v. General Motors Corp.,* 469 F.3d 1122, 1127-28 (7th Cir. 2006) (same, in ADA disparate treatment claim under the indirect method). It is undisputed that performing at a "meets" level is a requirement for Mobley's position, and although Mobley was told in September that she was close to achieving "meets" status, from April 2003 until her termination, Mobley never in fact raised her performance to a "meets" level. As a result, particularly given that Mobley acknowledges that her performance had slipped during that time and does not challenge Allstate's methodology for finding that she was performing below a "meets" level, Mobley cannot establish her prima facie case, and thus her claim fails.

### D. Retaliation

Mobley's final claim is that Allstate unlawfully retaliated against her by removing her from the huddle room in early March 2003 in response to her requests for accommodations in fall 2002, and also by placing her on RI status in August 2003 in reaction to her call to Allstate's complaint resolution line in March 2003. In order to establish a prima facie case of retaliation, Mobley must show evidence of: "(1) a statutorily protected activity; (2) an adverse action; and (3) a causal connection between the two." *Squibb*, 497 F.3d at 786 (quoting *Burks*, 464 F.3d at 758). Even if for each of these allegedly retaliatory acts the first two elements of the prima facie case have been met, Mobley fails in both circumstances to establish any causal connection between her protected activity and the adverse action. In both instances, the only evidence Mobley offers regarding causation is temporal proximity, noting that only a matter of months existed between her initial request for accommodations and removal from the huddle room, as is similarly the case for her complaint to Allstate's help line and subsequent placement on RI status. Evidence of temporal proximity, however, standing on its own, is insufficient to establish a causal connection for a claim of retaliation. *Burks*, 464 F.3d at 759 ("[Plaintiff] presents no evidence of a retaliatory motive other than the timing of her termination. Therefore, she has not met her burden under the direct method of proof."); *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("Speculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation."). Although there may be an exception to this general rule when the adverse action occurs "on the heels of protected activity," *see McClendon v.*

*Indiana Sugars*, 108 F.3d 789, 796 (7th Cir. 1997) (two to three day period separating protected activity and adverse action) (quoting *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994) (four weeks separating the protected activity and adverse action)), such a circumstance would be limited to matters occurring within days, or at most, weeks of each other. This can hardly be said to be the case here, where in both circumstances, months separated the alleged protected activity and adverse action. As a result, in the absence of any other evidence pointing towards causation, Mobley's retaliation claim also fails.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in Defendant's favor.

WOOD, *Circuit Judge*, concurring in part and dissenting in part. Summary judgment is appropriate, as everyone knows, only if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Applying that well-worn standard, the majority has concluded that Catherine Mobley has failed to show that a trial is needed to resolve her case. I agree with the majority that Mobley's presentation has indeed fallen short with respect to her retaliation claim. As I

read this record, however, there are genuinely disputed material facts relating to her claims under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.*, for failure to accommodate and wrongful termination. I would therefore reverse and remand for further proceedings on the latter two theories.

## I

I begin with Mobley's failure-to-accommodate claim, which rests on 42 U.S.C. § 12112(b)(5)(A). This part of the case hinges on the question whether Allstate accommodated Mobley in a timely and adequate fashion. My colleagues conclude that any reasonable trier of fact would have to conclude that it did, based on the crucial conclusion that Allstate "*eventually* reasonably accommodate[d] Mobley's disability." Op. at 11 (emphasis added). In so doing, the majority accepts as undisputed the proposition that Allstate learned of Mobley's disability only in mid-April 2003. In my view, however, the facts on which the majority's conclusion rests are fairly in dispute. Viewed in the light most favorable to Mobley, Allstate's failure to accommodate her more promptly both violated the ADA provision defining the term "discriminate" to include failure to accommodate and laid the groundwork for the problems that led to her eventual termination.

An exclusive focus on Mobley's work environment after April 2003 misses crucial parts of the story. Mobley first requested accommodation in the fall of 2002. Allstate acknowledges this (as it must), but it claims that everyone thought that she was seeking help only for a temporary disability. But a trier of fact could reject Allstate's asser-

tion that *all* the parties were under the impression that Mobley's disability was temporary until late March 2003. In fact, substantial record evidence supports Mobley's account, under which she made no such representation.

Allstate's sole citations to the record in support of its position refer us only to the district court's opinion and to Allstate's own brief below in support of its summary judgment motion, without identifying any specific evidence in the record to support this assertion. Appellee Br. at 4 (citing R. 85 at 5, 15-16; R. 46 at 6). When one turns to the district court's opinion for more detail, it turns out that the cited pages are also devoid of any references to evidentiary materials. When we consult the record itself, we find that this "fact" is far from undisputed. Mobley has at all times contested the idea that she viewed her disabling conditions—essential tremor and nocturnal myoclonus—as temporary. Indeed, as I now review in some detail, she has pointed to substantial evidence in the record indicating that she had alerted Allstate long before April 2003 that "the nature of her condition" was "chronic," "indefinite," and "lifelong."

In July 2002, months before making her first request for an accommodation (which happened in the fall of 2002) and nearly a year before she finally was accommodated, Mobley wrote in the comments section of an employee evaluation that she had "been unable to keep up due to health problems affecting my ability to concentrate, remember things, and mentally organize my thoughts so I make good decisions about how I work. A diagnosis has not been made, but I am under the care of a doctor and tests are being done. I am doing my best to hang on." App. 155. A month later, Mobley wrote, "I continue to struggle with a neurological problem which has now

been diagnosed, but for which, so far, the medication has provided no relief. I am having consistent followup with my neurologist in an effort to normalize my ability to concentrate and think logically." App. 157. Nothing in these comments suggests that Mobley believed that her condition was "temporary." If anything, she was describing a problem that was as yet unsolved, and was perhaps unsolvable, for which she was receiving ongoing care from a medical specialist.

The following month, on September 24, 2002, Mobley wrote that "[m]edications the doctor has changed to have made a great change in my ability to concentrate and think logically. However, because of the backlog of work, I'm behind and trying to catch up. I'm doing my best." App. 161. Allstate reads into this comment a concession from Mobley that her ailment was temporary. In my view, that is too much of a stretch, particularly bearing in mind the standard of review on summary judgment. A comment that her physician finally had found a medication that was producing some positive effects is not the same as an admission that her disability was "temporary." A condition that requires daily medication and ongoing treatment from a neurologist is better described as "chronic." Nothing in the quoted statement comes close to saying that Mobley thought that her condition was likely to dissipate in the near future. A trier of fact could draw the opposite conclusion. The latter inference would find support in Mobley's later comments in October 2002, when she gave Allstate a statement from her neurologist, "as well as the records of [her] treatment for Essential Tremor, Myoclonus, and Narcolepsy." App. 164. This is evidence of continued treatment for ongoing, diagnosed conditions, not an indication that she was on the path to full recovery.

Though Mobley again wrote that "medication appears to be improving" her condition, once again she did not claim or suggest that her problems were temporary. If believed by a trier of fact, these statements show that Allstate knew of Mobley's problems, and their ongoing nature, as early as September or October of 2002. They are inconsistent with Allstate's claim that Mobley "first confirmed" her diagnoses of essential tremor and myoclonus on November 18, 2002, Appellee Br. at 4, and that it first learned that Mobley had been diagnosed "with an other-than-temporary medical condition" in April 2003, *id.* at 16.

Further support for Mobley's position can be found in a report dated February 28, 2003, from Mobley's neurologist, Dr. Ghooray. Dr. Ghooray wrote that Mobley has "CHRONIC CONDITIONS REQUIRING MULTIPLE TREATMENTS"; he further noted that the condition began "6/2002" and that its probable duration was "indefinite." App. 498.

Beyond this evidence, the record contains statements from Allstate itself that are inconsistent with its claim that it thought that Mobley's disability was temporary up until April 2003. When defending in this court its decisions to deny Mobley's requests to work only on bodily injury ("BI") files or to work from home, Allstate claims that the employees Mobley offers as comparators were not "similarly situated" to her, because they requested accommodations for an "occasional, seasonal, and part-time" interim, or on a "purely temporary" basis, whereas "Mobley's request was for an ongoing" accommodation. Appellee Br. at 11-12. This is tantamount to an admission that its reason for denying Mobley certain accommodations—the same accommodations that it concedes it gave to other employees—was that the other workers needed only

temporary accommodations, whereas it understood Mobley to require *ongoing* accommodations.

It is telling that the special arrangements that Allstate admits that it offered to other employees had nothing to do with disabilities protected under the ADA. For example, Melanie Thurston occasionally was permitted to work from home during baseball season, so that she could attend her son's afternoon games; Nancy Muegge temporarily was allowed to work only on BI files "to catch up a backlog of those files." Allstate's own description of testimony from Office Manager Alex Balatsoukas, who supervised Nancy Brechbuhl (Mobley's direct supervisor), states that Balatsoukas made it "clear that permission [for Thurston] to work at home was sometimes allowed on an occasional basis, as compared to Mobley's request for a [*sic*] ongoing work-at-home arrangement." Balatsoukas also said that Muegge's "assignment" to BI-only files was "purely temporary" and thus unlike what Mobley was seeking, which was "an ongoing exemption." *Id.* Viewing the record favorably to Mobley, therefore, Allstate's own admissions show that it realized that Mobley's repeated requests for accommodation, which began in the fall of 2002, were not for a temporary condition. It believed that she was seeking ongoing, long-term adjustments.

Taking this evidence into account, I would find that Mobley can show that Allstate was aware of her ongoing, disabling condition at least by November 2002, and certainly no later than February 2003, when her neurologist's report stated that Mobley suffered from "CHRONIC CONDITIONS" of "indefinite" duration. Indeed, Mobley has shown that Allstate was failing to accommodate her for a significant period of time, between approximately

November 2002 and late April to early May 2003, when everyone agrees that Allstate finally acted. For this, we must examine Allstate's response to Mobley's requests to work in the "huddle room" (a measure that she believed would improve her concentration, and thus her productivity).

At a meeting Mobley had on November 18, 2002, with Balatsoukas, the two discussed Allstate's decision to evaluate Mobley as someone who "Requires Improvement." Mobley told Balatsoukas (apparently not for the first time) that she could achieve the needed improvement if she would be permitted to use a particular quiet room known as "the huddle room." Balatsoukas denied the request and remarked that Mobley had to perform her work "the same way everybody else does the work," or else be terminated. App. 309. Nevertheless, a week or two later, Brechbuhl informed Mobley that Balatsoukas had changed her mind, and Mobley could use the huddle room after all. As the majority notes, Mobley testified that Brechbuhl told her at the time that the reason for Balatsoukas's change of heart was that she was convinced Mobley was not disabled, and that Mobley's malingering would become clear if and when her assignment to the huddle room produced no improvement in her performance. App. 310. Balatsoukas denies telling Mobley that she had to do the work "the same way everybody else does" it, but on summary judgment, we must accept Mobley's account. Moreover, Brechbuhl's testimony corroborates Mobley's recollection. Brechbuhl stated: "Yes, Alex wanted—felt like that it—you know, Cathy needed to perform her job as all the other— . . . I mean, that's what Alex explained to me, . . . that it was an equality issue." App. 368-69. Brechbuhl could not recall Balatsoukas's precise words, but she stated that

"[i]t was just all related to equality issues." App. 369. Allstate's only real response to this exchange is to claim that Balatsoukas's motivations are irrelevant to the ultimate question whether the company reasonably accommodated Mobley.

While Balatsoukas's motivations are not dispositive, neither are they irrelevant. A jury could infer from the fact that Balatsoukas agreed to allow Mobley to use the huddle room just to show that she was incapable of succeeding under any circumstance that this was not a good-faith accommodation. Such an inference would be reinforced by the fact that Balatsoukas revoked Mobley's permission to work in the huddle room *immediately* after Mobley managed, within only six weeks of being provided with that accommodation, to raise her performance back up to "meets expectations" status. Indeed, Allstate's abrupt withdrawal of an accommodation that everyone admits was both a reasonable request and a successful arrangement is among the more troubling aspects of this case. It is undisputed that Balatsoukas was the final decision-maker with respect to accommodations, including the use of the huddle room. Brechbuhl testified that, had it been her decision, she would have allowed Mobley to stay in the room, because "[h]er performance had improved," and there were "more pros" than cons to Mobley remaining in the room. App. 369. Mobley's own comments on her evaluation for January 2003—the month in which she re-attained the critical "meets expectations" status—spoke of how helpful the quiet environment was to her. App. 172-73, 176.

Balatsoukas claimed that Mobley's success in restoring her status to "meets expectations" meant that she no longer needed to work in the huddle room. Balatsoukas

accordingly decided to prohibit her from doing so. App. 333. Allstate claims, and the majority accepts, that these events do not raise a genuine issue of material fact as to whether Allstate discharged its duty of reasonable accommodation under the ADA, because Allstate later offered the same accommodation in late April or early May 2003. This does not, however, cure the earlier re-fusal to accommodate before that time.

Lastly, I see no alternative grounds on which Allstate might prevail at the summary judgment stage on Mobley's failure-to-accommodate claim. A trier of fact could con-clude that the other measures that Allstate adopted were not reasonable accommodations for her disabling con-ditions. Allstate asserts that, in addition to allowing Mobley to use the huddle room, it also, "from May 2003 on," provided "other accommodations, including permis-sion to shift her schedule back a half hour; reassignment of at least 18 files to another worker; and being assigned only BI files." Op. at 13. The record shows, however, that Allstate never allowed Mobley to work exclusively on BI files. What it eventually did, after dragging its feet for a while, was to begin shifting her work assignments from the more complicated uninsured/underinsured motorist ("UM/UIM") files to the less complex BI files. Throughout this time, Mobley retained the backlog of UM/UIM files that she already had. See Appellee Br. at 6; Reply Br. at 5; App. 335-39 (Balatsoukas deposition, stating that Mobley was not allowed to work only on BI files); App. 371 (Brechbuhl deposition; same).

Second, when Allstate reassigned at least 14 of Mobley's files to other workers, the result was only to bring Mobley's case load down to a total of 184 files, one less than the highest number of files assigned to any other representa-

tive. This means that before the transfer, Mobley had 198 files, or 13 more than any of her co-workers. I fail to see how this redistribution of Mobley's workload (by far the heaviest among her cohorts) was a disability-based "accommodation"; a fact-finder could equally well see it as a simple transfer of files designed to distribute the work more evenly.

Finally, Mobley disputed Allstate's position that the schedule change (permitting her to work from 9 to 5:30 rather than from 8:30 to 5) was an accommodation, for she consistently said that it was of no help to her merely to shift her schedule by 30 minutes. It is also difficult to understand why Balatsoukas did not want Mobley to stay past 5:30 p.m. on certain days so that she could complete her work. Mobley was a salaried employee, not an hourly worker, and so the amount of time she spent in the office had no bearing on Allstate's obligations to her. Viewed separately, these circumstances likely would not amount to ADA violations, but taken in the context of the full record, they create a genuine issue of fact on the question whether Allstate fulfilled its duty of reasonable accommodation.

## II

Allstate alleged, and the majority accepts, that Mobley was terminated as part of a general reduction in force ("RIF") that Allstate was implementing, and thus that her termination had nothing to do with her disability. Allstate also asserts that in any event, Mobley was not meeting its reasonable expectations. But, on the latter point, if she was failing to meet its expectations only because of its failure to provide reasonable accommodation, then she

is entitled to proceed. An employer cannot defeat a *prima facie* case for one claim by committing a different violation. Finding this one element lacking, the majority does not analyze the other aspects of Mobley's *prima facie* case, nor does it reach the burden-shifting analysis that applies once the *prima facie* case is established. I would find that Mobley has met her burden on each element of her *prima facie* case, and that she has provided sufficient evidence of pretext to survive summary judgment. Moreover, she has also shown that a trier of fact could find that the RIF had nothing to do with her termination, and that it was instead ordered because of her disability.

The only other element of Mobley's *prima facie* case that Allstate challenged on appeal was whether similarly situated employees received more favorable treatment during the RIF. As I have already indicated in discussing Mobley's accommodation claim, there is enough evidence on this point to defeat summary judgment. Mobley presented evidence showing that Mike Hawkins, an employee in the same unit as hers with the same job title, same duties, and same supervisor (Balatsoukas), had performance numbers consistently lower than Mobley's during 2002 and 2003, and was on "requires improvement" status from June 2003 until September 18, 2003. This is more than enough to render Hawkins "similarly situated" to Mobley. See *Warren v. Solo Cup Co.*, 516 F.3d 627, 630-31 (7th Cir. 2008). Hawkins was not terminated in the RIF, even though Allstate claimed that it was terminating all employees who were on "requires improvement" status when human resources employee Sybil Brenner pulled a report of employees' status as of the end of August. There is some dispute over when exactly this data was pulled. Brenner testified that while she retrieved the data around

September or October 2003, the "info quest download" was for "August, month end." App. 380 (noting that the report printout reflects that it retrieved data from "August, month end"). Hawkins was on "requires improvement" status until September 18, 2003, and so he should have been on the RIF list.

These circumstances spill over into the issue of pretext. As I have already noted, Allstate's justification for firing Mobley was that she simply fell into the category of employees who were on "requires improvement" status on the critical date for determining whom to let go as part of the RIF. But because Hawkins would have been on the same list, the fact that he escaped the RIF and Mobley did not calls into question Allstate's decision. And this is not the only evidence Mobley has. There are other inconsistences between Allstate's claimed process for the RIF and the actual process that it followed. Mobley points out, for example, that not only were there people who were not subject to the RIF despite being on "requires improvement" status, but also there were people who *were* subject to the RIF who were not on that status.

The majority opinion declines to discuss these blemishes, having found that Mobley cannot make out her *prima facie* case. And the district court, despite deeming these inconsistencies "peculiar" and inexplicable, held that they presented "no serious challenge as pretext," because Mobley failed to show that the individuals who avoided termination were "similarly situated" to Mobley or "received treatment more favorable to Mobley." But that reasoning mixes up "pretext" analysis with the evaluation of a *prima facie* case. The issue of pretext arises only after an employee makes out her *prima facie* case. The question at that point is not whether an employee has

shown that others similarly situated to herself were treated more favorably, but rather whether the employer's *asserted* reasons for terminating the employee were in fact the *actual* reasons. Given the inconsistences in the record that I have already discussed, I cannot conclude as a matter of law that the RIF was conducted in the neutral way that Allstate claims. Whether a jury would ultimately find in Mobley's favor is, of course, not the question. On these facts, a reasonable jury could do so.

### III

For these reasons, I conclude that Mobley has presented enough evidence to move forward on her failure-to-accommodate and termination claims. Accordingly, while I join the majority's resolution of Mobley's retaliation claim, I respectfully dissent from its decision to affirm summary judgment on the other two theories.