In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-1476

GERALD D. LLOYD,

*Plaintiff-Appellant,*

*v.*

SWIFTY TRANSPORTATION, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:05-cv-1171-LJM-WTL—**Larry J. McKinney**, *Chief Judge.*

ARGUED APRIL 1, 2008—DECIDED JANUARY 9, 2009

Before CUDAHY, RIPPLE, and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. Gerald Lloyd sued Swifty Transportation, where he worked as a truck driver for nearly seven years. He principally claimed that Swifty violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213, by passing him over for promotion, disciplining him, paying him less than non-disabled drivers, and eventually forcing him to quit his job. Lloyd also claimed that Swifty violated the Family and Medical Leave Act, 29 U.S.C. §§ 2601-2654, by retaliating against

him for taking medical leave. He further claimed that the company breached an agreement to interview him for future promotions. The district court granted summary judgment for Swifty on all claims. We affirm.

As a result of a motorcycle accident in August 1997, Lloyd's left leg was amputated below the knee. Six months later he started using a prosthetic leg. He generally can wear the prosthesis for up to 12 hours a day but removes it to sleep. Lloyd's prosthesis is largely unnoticeable under his pants, and he uses it so effectively that people sometimes do not realize he is an amputee. He can walk about a mile on a good day but cannot run or jog. He can also shop for himself, though he sometimes uses a motorized cart, and can drive while wearing his prosthesis. If he has to move quickly, however, he must hop, which creates a risk that he will fall and injure himself.

The prosthesis causes some difficulties for Lloyd. His leg swells at night while he is sleeping, so he must "put himself together" each morning, which involves using crutches or hopping on his right leg, cleaning the liner for his prosthesis, and preparing his skin. In total this adds about 20 minutes to his morning routine. Moreover, the prosthesis does not fit perfectly, so he has to change the lining several times a day. The prosthesis has caused a skin-stretching condition, which creates pain, soreness, and a burning sensation. Lloyd had one surgery to tighten the skin, but the condition persists. Lloyd also gets bacterial infections, known as cellulitis, in his left knee that if not properly treated keep him from walking for three or four days.

Lloyd had been a truck driver before his motorcycle accident. He applied for and received a limb waiver from the Indiana Department of Transportation in May 1998 so that he could go back to work. Swifty hired him as a night-shift driver in June 1998 knowing that he uses a prosthetic leg. Swifty hauls gasoline to stations in a five-state area and employed no more than forty-two people in 2003 and 2004. Swifty has a fleet of twelve gasoline tanker trucks, each with a day-time lead driver and two night-shift drivers. Lead drivers have a few more responsibilities than other drivers, such as dealing with scheduling issues and mechanical problems on the trucks, and are generally paid more, but they are not supervisors.

In October 2001 a lead-driver position became available. Max Eldridge had been a lead driver but told Swifty that he would give up that job and transfer to a vacant night-shift position if Swifty rehired Mike Blackford to replace him. Blackford had previously worked for Swifty and left on good terms. Lloyd told his lead driver and his supervisor that he was interested in the open lead-driver position, but Swifty hired Blackford without interviewing Lloyd. Lloyd filed a charge of discrimination with the Equal Employment Opportunity Commission in June 2002, claiming that because of his disability he was denied the lead-driver position despite having more seniority than Blackford. Four months later Lloyd and Swifty entered into a Negotiated Settlement Agreement binding Lloyd to forego suing in exchange for Swifty's promise to notify him about future vacancies for lead

drivers and interview him if he applied. The EEOC issued a right-to-sue letter on October 30, 2002.

A lead-driver position next opened up in June 2003, and Lloyd applied. The president of Swifty and supervisors Pat Adamson and Lesli Stevens interviewed Lloyd and three other drivers and ultimately selected Marvin Smith. Based on the criteria that lead drivers must solve daily mechanical problems and handle scheduling issues, the hiring team thought that Smith was best qualified because he had more knowledge of the mechanics and maintenance of trucks, had a positive attitude, and related better to the other truck drivers. In contrast, other drivers had complained about Lloyd's attitude and inability to cooperate with them. Smith became lead driver of Lloyd's assigned truck and made changes that Lloyd did not like, in particular switching the fuel hoses from one side of the truck to the other and altering Lloyd's hours. Lloyd filed a second EEOC charge in August 2003, claiming that Swifty selected Smith over him because of his disability, and that Smith's changes were made in retaliation for filing his first EEOC charge. The EEOC issued a right-to-sue letter on September 25, 2003.

Twice more Swifty passed over Lloyd for a lead-driver position. In January 2004, after a lead driver told Swifty he would be moving soon and wanted to work night shifts until then, Swifty promoted Greg McNeely to the position without interviewing Lloyd, although Lloyd had asked Adamson for an interview. At summary judgment Adamson and Stevens explained that they chose McNeely because he had ten years of experience as a night-shift

driver at Swifty and would not need to be trained. They said they did not consider Lloyd because he continued to have a negative demeanor and did not get along with others. Ten months later, Swifty replaced Paul Combes, the lead driver of the only truck assigned to the Muncie, Indiana, area. Combes had "cross dumped" kerosene into a gasoline tank, a serious offense for which Swifty demoted him to night-shift driver. Swifty replaced him with Tony Cave, a night-shift driver on that truck who was highly recommended by his previous employer and had been a good employee at Swifty. Swifty did not consider this lead-driver position to be vacant and thus did not inform other drivers about the opening.

Throughout this time Lloyd also was subjected to a few incidents that he characterizes as harassment. In July 2004 Lloyd was in his own car talking on his cell phone when Marvin Smith confronted him and demanded to know if he was talking with one of his "bitches" and "one of his fucking whores." Lloyd hit Smith with his door while trying to close it, and Smith told him he would not have a job tomorrow. When Lloyd complained to his supervisors, Swifty's president told him to "just go to work." In October of that year the driver's side door of Lloyd's car was badly dented while the car was parked in a secured lot used by Swifty employees. Lloyd complained to Stevens but had no evidence that a Swifty employee caused the damage. Finally, in December an employee at one of the stations where Swifty delivered gas told Lloyd that another driver had made derogatory comments about him. The station employee had a cast on his leg at the time and was limping, and the other

driver suggested that the employee should "fall over" like Lloyd and "get paid" for an extended period of time without working.

During this time Swifty also granted Lloyd two medical leaves to give him time to correct complications related to his prosthesis. While negotiating the settlement agreement about his first EEOC charge in 2002, Lloyd requested and received an eighteen-week leave of absence. He was able to return to work despite Swifty's policy that an employee who is away from work for more than sixteen consecutive weeks will be fired. In October 2004, Swifty granted Lloyd a two-week leave to recover from a bout of cellulitis.

Despite the complications surrounding Lloyd's employment over the years, he was never disciplined until he received a written reprimand in January 2005. Lloyd had twice loaded gas from the wrong supplier, which caused Swifty significant monetary loss. The day after receiving the reprimand Lloyd filed a third EEOC complaint. He claimed that the reprimand, the lack of promotion, and a salary he perceived to be less than what other drivers earned were all attributable to his disability and to Swifty's effort to retaliate for his previous EEOC charges. As to his compensation, Lloyd alleged that Swifty paid less-senior drivers who were not disabled more than it paid him. He pointed to Clyde Williams, who earned $.60 more per hour but had been working for Swifty only two or three years compared to Lloyd's seven, and Combes, who received not just the extra $.60 but also health insurance. Swifty, however, presented testimony

that wages and benefits were based on "business-related factors, including profitability of the truck, efficiency of the truck, the individual's contribution to the truck, the individual's performance, and labor market forces." Indeed, Swifty's employee handbook states that many factors, including the "profitability of the company" and the "individual's contribution," are weighed in making compensation decisions. Lloyd had started at $12.00 per hour and received three raises: to $12.30 per hour in January 1999, to $13.00 per hour in January 2003 after his first EEOC charge, and to $13.40 per hour in January 2004 after the third missed promotion. The EEOC issued a right-to-sue letter on May 16, 2005.

Meanwhile, after filing his third EEOC charge, Lloyd was disciplined twice more and was granted two more medical leaves. In late January 2005 he loaded gas from the wrong supplier two more times, at which point Swifty suspended him without pay for three days. Adamson and Bob Elgin, who, along with Adamson and Stevens, made personnel decisions after Swifty's president resigned, tried to call Lloyd on his cell phone to notify him about the suspension so that he would not come to work. When Lloyd did not answer their calls, they went to his house and knocked on his door numerous times. Lloyd decided they were harassing him and did not answer the door. They left and returned a short while later, and again Lloyd refused to answer the door. Instead, he called the police. When an officer came to his house, the officer delivered the suspension notice to Lloyd. The next month, February 2005, Lloyd received another written reprimand. Despite these problems, Swifty granted Lloyd a one-week leave in March 2005 to recover

from cellulitis and another leave in May 2005. During the latter leave, Lloyd found another job and resigned from Swifty. Adamson, however, recommended that Lloyd be eligible for rehire.

Lloyd filed a complaint in federal court in August 2005. He claimed, first, that Swifty had repeatedly failed to promote him to lead driver, disciplined him, paid him less than other drivers, and created a hostile work environment that led him to quit, all because of his disability and because of his EEOC charges. Lloyd also claimed that Swifty disciplined him in part to retaliate for taking FMLA leave. Finally, Lloyd claimed that Swifty had breached the Negotiated Settlement Agreement by not interviewing him for two open lead-driver positions.

The district court granted Swifty's motion for summary judgment. The court held that any claim concerning the first two times Swifty passed over Lloyd for promotion was time barred. The court also rejected the FMLA claim because Swifty employs fewer than fifty employees and is not subject to the act. The court then held that Lloyd's remaining ADA claims failed because he presented no evidence to rebut Swifty's legitimate, non-discriminatory reasons for not promoting him, disciplining him, and paying him as it did, and because Lloyd had not exhausted his allegations concerning the work environment at Swifty or his decision to quit. Finally, the court concluded that Lloyd's claim about the prior settlement could not proceed because he did not present evidence of any damages he suffered.

We review the district court's grant of summary judgment de novo, construing all facts and reasonable inferences in the light most favorable to Lloyd, the nonmoving party. *See Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 544-45 (7th Cir. 2008). We will affirm if the evidence at summary judgment establishes that there is no genuine issue of material fact and that Swifty is entitled to judgment as a matter of law. *See* FED. R. CIV. PRO. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

We agree with the district court that Lloyd's claims regarding the first two times Swifty did not promote him to lead driver—in October 2001 and June 2003—are time barred. Under the ADA a plaintiff must file suit within ninety days of receiving notice of his right to sue. 42 U.S.C. § 2000e-5(f)(1); *Houston v. Sidley & Austin*, 185 F.3d 837, 838-39 (7th Cir. 1999); *Sanders v. Venture Stores, Inc.*, 56 F.3d 771, 775 (7th Cir. 1995). The EEOC issued right-to-sue letters in response to Lloyd's first two charges, which encompassed his complaints about the first two times he was not promoted, in October 2002 and September 2003. Lloyd did not file suit until August 2005, well over ninety days after each letter.

Similarly, the district court properly granted summary judgment for Swifty on the FMLA claim because Swifty is not subject to the FMLA. That statute governs enterprises with fifty or more employees. 29 U.S.C. § 2611(4); *Stoops v. One Call Commc'ns, Inc.*, 141 F.3d 309, 311-12 (7th Cir. 1998). It was Lloyd's burden to establish that Swifty had at least fifty employees, *see Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 590 (7th Cir. 2008), but he failed to do

that. Lloyd argues that Swifty presented only a con-
clusory affidavit attesting that its workforce was no
greater than forty-two people in 2003 and 2004 without
supporting evidence, such as payroll records. He also
contends that a letter he received from Swifty about his
FMLA rights in 2000 creates a genuine issue of material
fact. But Swifty was not required to provide supporting
evidence, *see Celotex*, 417 U.S. at 323; *Keri v. Bd. of Trs. of
Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006), and Lloyd
did not present any evidence to rebut the affidavit. More-
over, Swifty's 2006 handbook, which Swifty placed in
evidence, states that it is not subject to the FMLA. Finally,
the 2000 letter is irrelevant because none of Lloyd's allega-
tions involve events that year. *See Komorowski v. Townline
Mini-Mart & Rest.*, 162 F.3d 962, 966 (7th Cir. 1998).

As to the remainder of his ADA claims, Lloyd did not
present a genuine issue of material fact. He argues that
he is disabled as defined under the ADA and that the
district court erred by ignoring the detriments of his
corrective device—his prosthesis. He also argues that the
district court erred by concluding that he did not show
that the legitimate, non-discriminatory reasons put forth
by Swifty for not promoting him in January and Novem-
ber 2004, disciplining him, and paying him less than
some other drivers were actually pretextual.

The ADA prohibits employers from discriminating
"against a qualified individual with a disability because
of [his] disability." 42 U.S.C. § 12112(a); *Buie v.
Quad/Graphics, Inc.*, 366 F.3d 496, 502 (7th Cir. 2004). A
plaintiff, like Lloyd, who lacks direct evidence of dis-

crimination may proceed under the indirect method by first establishing a prima facie case. To do so the plaintiff must show that: (1) he is disabled under the ADA, (2) he was meeting his employer's legitimate employment expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees without a disability were treated more favorably. *Mobley*, 531 F.3d at 548; *Rooney v. Koch Air, LLC*, 410 F.3d 376, 380-81 (7th Cir. 2005). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Buie*, 366 F.3d at 503. The plaintiff must then prove by a preponderance of the evidence that the defendant's reasons are pretextual. *Id.* The analysis for a retaliation claim is similar: the plaintiff must show that he engaged in protected activity, was performing his job satisfactorily, and was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not suffer. *See Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 788 (7th Cir. 2007); *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). We analyze Lloyd's discrimination and retaliation claims together because they fail for the same reasons.

Although the district court focused on Swifty's reasons for passing over Lloyd for promotion, disciplining him, and paying him less than some other drivers, we need not discuss those reasons because Lloyd did not establish a prima facie case. *See Rooney*, 410 F.3d at 381. To begin with, Lloyd did not show that he was qualified for promotion to lead driver. *See Miller v. Ill. Dep't of Corr.*, 107

F.3d 483, 484 (7th Cir. 1997). The ADA protects only a "qualified individual," someone with a disability who can perform the essential functions of the job with or without reasonable accommodation. 42 U.S.C. § 12111(8); *see Jackson v. City of Chi.*, 414 F.3d 806, 811 (7th Cir. 2005). The employer, not a court, determines what functions are essential, and we will not second-guess that decision. *Jackson*, 414 F.3d at 811. Swifty said that lead drivers must have knowledge of the mechanics of the trucks and be able to manage the other drivers on the truck through a positive attitude and ability to get along well with others. But the supervisors in charge of hiring lead drivers testified without contradiction that Lloyd had a negative attitude that drew complaints from other drivers. That poor attitude, according to management, continued through January 2004 when Swifty promoted McNeely without interviewing Lloyd. Swifty also said that it did not consider the position swap between Combes and Cave in November 2004 to be a vacancy. Here the second prong of the prima facie case and the pretext question do merge because Lloyd argues that Swifty's reasons for not selecting him were pretextual. *See Hague v. Thompson Distribution Co.*, 436 F.3d 816, 823 (7th Cir. 2006). Yet Lloyd argues on appeal only that Swifty's reasons are pretextual because he was not interviewed. The district court correctly found that Lloyd did not present any evidence to rebut Swifty's conclusion that Lloyd was not qualified for the January 2004 opening and that Lloyd made no argument to rebut Swifty's explanation that the November 2004 position swap was not a vacancy. Thus we agree with the court's grant of summary judgment to Swifty on Lloyd's claims that

Swifty discriminated and retaliated against him by not promoting him in January and November 2004.

We also uphold the district court's grant of summary judgment on Lloyd's claims that Swifty discriminated and retaliated against him by disciplining him. Lloyd does not dispute that he committed the infractions for which he was disciplined—loading gas from the wrong supplier—but, rather, he argues that drivers without a disability who did the same thing were not similarly disciplined. Lloyd must first show that the discipline constituted an adverse employment action. *See Mobley*, 531 F.3d at 548. Lloyd received two written reprimands for loading gas from the wrong supplier, but written reprimands without any changes in the terms or conditions of his employment are not adverse employment actions. *See Johnson v. Cambridge Industr., Inc.*, 325 F.3d 892, 902 (7th Cir. 2003); *Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001). Lloyd was also suspended for three days without pay after the second incident. Yet although that suspension was an adverse employment action, *see Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005); *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002), Lloyd could not challenge it in court because it occurred after he filed his final EEOC charge. A plaintiff may litigate claims that were not included in an EEOC charge only if the underlying events are reasonably related to the charges in the EEOC compalint. *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 550 (7th Cir. 2002). Lloyd's suspension was not reasonably related to his final EEOC charge because the discipline was imposed for additional infractions that occurred

later and were thus unforeseeable to Swifty. *See Geldon v. S. Milwaukee Sch. Dist.*, 414 F.3d 817, 819-20 (7th Cir. 2005); *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 920 (7th Cir. 2000). In any event, Lloyd did not show that any driver without a disability was not disciplined for similar misconduct. Lloyd argues that three other drivers—Combes, Williams, and Ray Hueston—all "cross-dumped" without being disciplined. But cross-dumping, which involves putting the wrong product into the wrong tank, is not the same as loading gas from the wrong supplier. *See Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008); *Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 745 (7th Cir. 2002). Moreover, Combes *was* disciplined—he was demoted from lead driver to night-shift driver. As to Williams and Hueston, Lloyd presented no evidence about their alleged infractions and, indeed, admitted in his deposition that he had no personal knowledge about their infractions and had heard only second-hand that they may have cross-dumped without being disciplined. *See Smith v. Dunn*, 368 F.3d 705, 709 (7th Cir. 2004).

Similarly, the district court properly granted summary judgment to Swifty on Lloyd's claims about his pay. Lloyd failed to establish a prima facie case because he did not put forth any evidence showing that he was paid less than similarly situated drivers without a disability. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007); *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 338 (7th Cir. 1993). Swifty employed twenty-two night-shift drivers, ten of whom earned less than Lloyd. Lloyd pointed to two night-shift drivers whom, he argues, were paid more despite having less seniority. But the title "night-

shift driver" alone did not make these drivers similarly situated. Swifty bases pay decisions on several business-related factors, including the profitability of the truck and the performance of the driver, and not on seniority or title. Moreover, Swifty increased Lloyd's pay four times, including twice after he filed EEOC charges and took leaves of absence, and Lloyd does not suggest how his lower pay could be construed as retaliatory in light of these raises.

We, too, uphold the grant of summary judgment for Swifty on Lloyd's claims that Swifty created a hostile work environment and constructively discharged him. We have not decided whether allowing a hostile work environment is actionable under the ADA. *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005). The district court granted summary judgment on these claims because it found that Lloyd did not make any argument about why a harassment claim should be recognized or raise a factual question as to the merits of the potential claim. On appeal Lloyd reiterates the facts that he supposes show that he was harassed and constructively discharged—that Marvin bothered him while he was on his cell phone, someone kicked his car, a co-worker joked with a gas station attendant about breaking his leg and getting paid for not working like Lloyd, and Adamson and Elgin called him several times on his cell phone and came to his house to notify him of his suspension. In order to prove a hostile work environment claim, "the alleged harassment must be 'both subjectively and objectively so severe and pervasive as to alter the conditions of [his] employment and create an abusive working environment.'"

*Whittaker*, 424 F.3d at 645 (quoting *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir. 2004)). Whether or not Lloyd properly exhausted this claim, it fails because none of these incidents, taken alone or together, meets this standard.

Finally, summary judgment was proper as to Lloyd's breach-of-contract claim, which arises under Indiana law. To prevail at trial Lloyd would need proof of the existence of a contract, a breach by Swifty, and damages. *Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 614 (Ind. Ct. App. 2000); *see Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007). The parties agree that Lloyd submitted evidence of the first two elements. But the district court held that Lloyd did not show that the contracting parties contemplated that Lloyd would receive damages for a breach equal to what he would have been paid had he been promoted, *see Fairfield Dev., Inc. v. Georgetown Woods Senior Apartments Ltd. P'ship*, 768 N.E.2d 463, 473 (Ind. Ct. App. 2002), because the contract simply obligated Swifty to interview him, not necessarily promote him. It is undisputed that Lloyd would not have been promoted, but he suggests that he should be eligible for damages for being denied even the opportunity to interview for the lead-driver positions in January and November 2004. The district court observed that the Indiana courts have not yet recognized lost-opportunity damages in contracts cases. In this court Lloyd does not disagree or provide any authority that the district court is wrong. More importantly, Lloyd failed to produce any evidence about lost-opportunity damages.

For the foregoing reasons, we affirm the judgment of the district court.