In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-3125

TERRENCE PREDDIE,

*Plaintiff-Appellant,*

*v.*

BARTHOLOMEW CONSOLIDATED SCHOOL
CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:12-cv-00995-TWP-DML — **Tanya Walton Pratt**, *Judge.*

ARGUED APRIL 9, 2015 — DECIDED AUGUST 24, 2015

Before FLAUM, RIPPLE, and WILLIAMS, *Circuit Judges.*

PER CURIAM. Terrence Preddie worked as a fifth-grade
teacher at Columbus Signature Academy-Codrea Elemen-
tary School—part of the Bartholomew Consolidated School
Corporation ("BCSC")—during the 2010–2011 school year.
After Mr. Preddie was absent twenty-three times, the BCSC
did not renew his contract. Mr. Preddie is diabetic, and his
son, Elliot, suffers from sickle cell anemia. Mr. Preddie is al-

so African-American. Following the non-renewal of his contract, Mr. Preddie filed suit against the BCSC in state court, alleging claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act ("ADA"), the Family and Medical Leave Act, ("FMLA"), 42 U.S.C. § 1981, and the Civil Rights Acts of 1866, 1871, and 1991. The case was removed to the Southern District of Indiana, and the district court granted summary judgment in favor of the BCSC on all of Mr. Preddie's claims. We affirm the district court's judgment for the BCSC except as it relates to Mr. Preddie's FMLA claims. With respect to Mr. Preddie's FMLA interference and retaliation claims, we believe that genuine issues of material fact preclude judgment for the BCSC on the present record. We therefore reverse the district court's judgment on those claims and remand for further proceedings in the district court.

# I

# BACKGROUND

## A. Facts

Because the district court entered summary judgment for the BCSC, we view the facts in the light most favorable to Mr. Preddie, the nonmoving party. *See, e.g.*, *Gerhartz v. Richert*, 779 F.3d 682, 685 (7th Cir. 2015).[1]

---

[1] In awarding summary judgment to the BCSC, the district court determined that certain statements in Mr. Preddie's affidavit were inconsistent with his deposition testimony and, therefore, did not consider those statements in opposition to the BCSC's motion for summary judgment. That approach is consistent with our precedent. *See, e.g.*, *Russell v.*

(continued…)

The BCSC is a public school corporation located in Columbus, Indiana, encompassing several schools, including Rockcreek Elementary School ("Rockcreek") and Columbus Signature Academy-Fodrea ("CSA-Fodrea"). In 2009, the BCSC hired Mr. Preddie as a second-grade teacher at Rockcreek under a one-year teaching contract. Before his temporary contact expired, Dr. Linda DeClue, the Assistant Superintendent for Human Resources at the BCSC, wrote Mr. Preddie a letter advising him that his contract with the district would expire in June 2010 and that, if he wished to be considered for another position for the following year, he would need to submit a new application. At the bottom of the letter, Dr. DeClue wrote a short note indicating that the BCSC wanted to find a teaching position for Mr. Preddie the following year.[2]

Dr. Diane Clancy, the principal at CSA-Fodrea, contacted Mr. Preddie and asked that he consider applying for a fifth-grade teaching position at CSA-Fodrea for the 2010–2011 school year. After meeting with Dr. Clancy and submitting an application, Mr. Preddie was hired for the position, again under a one-year teaching contract.

As required by BCSC policy, Dr. Clancy completed written evaluations of Mr. Preddie's performance for each se-

---

(…continued)

*Acme-Evans Co.*, 51 F.3d 64, 67–68 (7th Cir. 1995) ("Where deposition and affidavit are in conflict, the affidavit is to be disregarded … ."). Mr. Preddie does not contest the district court's ruling, and, therefore, we, like the district court, limit our consideration of Mr. Preddie's affidavit to those statements that do not conflict with his deposition testimony.

[2] *See* R.30-5 ("BCSC doesn't want to lose you!").

mester of the 2010–2011 school year. In the first-semester re-
port, Dr. Clancy assessed Mr. Preddie as "Effective" in the
areas of "Planning and Presenting Organized Instruction,"
"Assessment," and "Professional Responsibilities," and as
"Needs Improvement" in the areas of "Classroom Manage-
ment" and "Motivation."[3]

Of specific concern to Dr. Clancy was Mr. Preddie's fail-
ure to leave organized and developed lesson plans for sub-
stitute teachers. Dr. Clancy discussed this concern with Mr.
Preddie in early November 2010, after Mr. Preddie's return
from a two-day absence. Mr. Preddie's son, Elliot, had been
admitted to Riley Hospital, necessitating Mr. Preddie's ab-
sence from school. According to Mr. Preddie, Dr. Clancy
told him during this discussion that he could not keep tak-
ing time off to care for his son; Dr. Clancy stated: "'You've
missed a lot of school for yourself. You can't take off. Is there
anybody that can go pick up your son or anybody that can
take care of your son, 'cause you've already missed enough
days for yourself?'"[4]

Immediately following this meeting, Mr. Preddie sent
Dr. Clancy an email that elaborated on his son's condition:

> As with Elliot, I think that we have a good plan
> moving forward. Thank you for working with

---

[3] R.30-14 at 2. "Effective" and "Needs Improvement" were the only two
ratings on the BCSC's evaluation form. *Id.* The categories on the evalua-
tion form also included "Human Relations and Communication." *Id.*
This evaluation area, however, was not filled out on Mr. Preddie's first-
semester evaluation.

[4] R.50-2 at 5 (Preddie Dep. 36); *see also id.* at 7 (Preddie Dep. 40).

me to make sure that if I have to be gone, my students don't have to suffer. One thing that I am not sure of is if you understand the disease my son suffers from. I know that sickle cell is a disease that mainly affects African Americans and it is something that you don't see in Columbus often. Sickle Cell is deadly, and causes my son great pain, so severe that he received morphine around the clock while at Riley all weekend.

I think that if I would compare the sensitivity of his illness to another illness it would be like epilepsy, for which there is no cure and requires the attention of medical personnel immediately. If there was an employee that had a child with epilepsy, I'm not sure they would be expected to come in and wait for a sub while the child recovers from a seizure, especially when it's something that happened without warning, early in the morning. The sooner we catch it, the least amount of time we have to spend in the hospital. I will do my best to make the appropriate arrangements if I need to be out and know in advance, but there may be a time where he gets sick without warning and we have to rush him up to the doctor. During times like these I would like to know that I have the support of the faculty and staff, and

not feel like I am being ostracized or punished because my son was in the hospital.[5]

In response, Dr. Clancy sent an email which read, in part:

You are absolutely right; I know very little about the Sickle Cell disease. I hope you will continue to educate me, so I will know what is fair for me to expect when Elliot is sick. I'm not sure I agree with your comparison of Epilepsy and Sickle Cell, but again, that may be due to my lack of knowledge of the Sickle Cell disease.

Please let me know how I can help and support you.[6]

During the 2010–2011 school year, Mr. Preddie recorded twenty-three absences, five of which were for "Family Illness," and seven of which were for "Sick Days."[7] Two of Mr. Preddie's sick days were the result of his admission to the hospital in November 2010 due to a physical illness that adversely affected his diabetes. Mr. Preddie also missed six days from late February to early March 2011, after a hospital admission for acute hypertension and kidney failure.[8] The BCSC recorded three of those absences as "Personal Day[s]" and the other three as "Leave W/O Pay," because Mr. Pred-

---

[5] R.30-11 at 2.

[6] R.30-12 at 2.

[7] R.50-4.

[8] R.50-2 at 3–4 (Preddie Dep. 21–22).

die already had exhausted his allotment of paid sick days.[9] According to Mr. Preddie, when he missed work due to a hospital stay, he "always" informed Dr. Clancy "exactly why [he] was in the hospital."[10]

When Mr. Preddie had used all of his paid leave, Dr. Clancy advised him "that he could apply for additional leave under the Family Medical Leave Act," but "that he would need [to] make a written application for that leave."[11] She also supplied Mr. Preddie with the name of "the person within the school corporation he would need to speak with regarding that application."[12] Despite his repeated absences, Mr. Preddie never specifically requested time off under the FMLA.[13]

Shortly before his second-semester review, Dr. Clancy again spoke with Mr. Preddie concerning his absences due to Elliot's condition. Mr. Preddie testified that Dr. Clancy told him that "sickle cell wasn't a serious enough disease" and that he could not take any more time off for his son because it was affecting his classroom.[14] Following this discussion, Mr. Preddie did not have any additional absences. Indeed, Mr. Preddie testified that "[t]he last time [Elliot] got sick[] that school year, I called my wife" to come down from

---

[9] R.50-4 at 2–3.

[10] R.30-1 at 11 (Preddie Dep. 65).

[11] R.30-9 at 9.

[12] *Id.*

[13] *See* R.30-1 at 3 (Preddie Dep. 26).

[14] R.50-2 at 5 (Preddie Dep. 36).

Indianapolis to pick Elliot up because Mr. Preddie believed that "there w[ould] be repercussions" for any additional absences.[15]

Dr. Clancy gave Mr. Preddie his second-semester performance report in mid-March 2011. In contrast to his first-semester performance report, Dr. Clancy assessed Mr. Preddie as "Need[ing] Improvement" in all evaluation categories for the second semester.[16] Dr. Clancy also recommended that Mr. Preddie's contract not be renewed for the 2011–2012 school year.

Shortly thereafter, the BCSC school board voted not to renew Mr. Preddie's contract. The board gave the following reasons for its decision:

1. Poor classroom management
2. No lesson plans or lesson plans that were difficult to follow. His partner teacher had to copy his plans for the sub.
3. Inappropriate methods of disciplining students.
4. Repeated parent, student, and staff complaints about chaos, lack of fairness in disciplining students, one staff member reported Mr. Preddie was observed bullying another student.
5. Does not work well with colleagues
6. Attendance is affecting student progress
7. Asked more than once for extra work so

---

[15] R.30-1 at 6 (Preddie Dep. 46).

[16] R.30-16.

students could improve grades, but work
was never provided

8. Lack of student engagement and inter-
est[.[17]]

## B. District Court Proceedings

On June 6, 2012, Mr. Preddie filed a complaint against the
BCSC alleging that: (1) the BCSC unlawfully discriminated
against him on the basis of race in violation of Title VII,
and/or retaliated against him for asserting rights under Title
VII; (2) the BCSC failed to accommodate his disability under
the ADA; (3) the BCSC failed to provide him with leave to
which he was entitled under the FMLA; (4) the BCSC dis-
criminated against him due to his race in violation of the
Civil Rights Act of 1866, as amended (codified at 42 U.S.C.
§ 1981 *et seq.*), the Civil Rights Act of 1871, as amended (codi-
fied at 42 U.S.C. § 1983 and/or 1986 *et seq.*), and the Civil
Rights Act of 1991, as amended (codified at 42
U.S.C. § 1981(a) *et seq.*); and (5) the BCSC unlawfully retaliat-
ed against him for his opposition to unlawful practices
and/or the exercise of his rights under the Civil Rights Acts
of 1866 and 1871, Title VII, the ADA, and/or the FMLA. Mr.
Preddie filed his complaint in the Bartholomew Superior
Court; the BCSC removed the case to the United States Dis-
trict Court for the Southern District of Indiana.

The district court set a dispositive motion deadline for
August 18, 2013. On August 19, the BCSC filed a motion for
an extension of time; the title of the motion requested an ex-

---

[17] R.50-9 at 2.

tension of time for *both* discovery and dispositive motions, but the text of the motion did not address the dispositive motion deadline. In response, the district court extended the deadline for discovery until September 18, 2013, but stated in its order that its extension of the discovery deadline did not affect the deadline for dispositive motions (which remained August 18, 2013).

On September 18, 2013, the BCSC filed a motion for summary judgment on all of Mr. Preddie's claims.[18] On September 30, the district court issued an order to show cause asking the BCSC to explain the late filing of its summary judgment motion. The BCSC subsequently filed a motion for leave to file a belated motion for summary judgment. On October 15, the district court granted the BCSC's request to file a belated motion for summary judgment; the district court found that the BCSC mistakenly believed that the deadline for dispositive motions had been extended to September 18, 2013, and that the belated motion for summary judgment was filed in good faith.

On August 27, 2014, the district court granted summary judgment in favor of the BCSC on all of Mr. Preddie's claims. Mr. Preddie appealed the district court's grant of summary judgment, as well as the court's decision to allow the BCSC to file a belated motion for summary judgment.

---

[18] Although the BCSC moved for summary judgment on all claims, it made no argument in its brief concerning Mr. Preddie's claim under 42 U.S.C. § 1986. *See infra* Part II.D.

## II

## DISCUSSION

We review the district court's rulings on summary judgment de novo. *Carter v. Chi. State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015). Summary judgment is appropriate when, construing the record in the light most favorable to the nonmovant, we conclude that no reasonable jury could rule in favor of the nonmoving party. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

### A. Mr. Preddie's ADA claims

Mr. Preddie makes two distinct claims under the ADA: (1) that the BCSC violated his rights under the ADA by failing to provide a reasonable accommodation for his disability, and (2) that the BCSC unlawfully retaliated against him because of his disability by declining to renew his teaching contract for the 2011–2012 school year. Mr. Preddie argues that we should reverse the district court's grant of summary judgment in favor of the BCSC on these claims. We disagree.

#### 1. Failure to accommodate claim

In order to establish a claim for failure to accommodate under the ADA, Mr. Preddie must establish that: (1) he is a qualified individual with a disability; (2) the BCSC was aware of his disability; and (3) the BCSC failed to reasonably accommodate that disability. *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747–48 (7th Cir. 2011). The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions

of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

In our view, Mr. Preddie's failure to accommodate claim cannot succeed for two reasons: (1) Mr. Preddie never requested an accommodation; and (2) Mr. Preddie does not meet the definition of a qualified individual with a disability under the ADA. First, we note that a plaintiff typically must *request* an accommodation for his disability in order to claim that he was improperly *denied* an accommodation under the ADA. *See Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 608 (7th Cir. 2012) ("[T]he standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches … .") (quoting *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000)). Although it is fair to assume that the BCSC was aware of Mr. Preddie's diabetic condition, there is no evidence to suggest that Mr. Preddie ever requested an accommodation for this condition, other than intermittently requesting days off throughout the school year. Without such a request, we conclude that Mr. Preddie's failure to accommodate claim under the ADA does not survive summary judgment.

Additionally, Mr. Preddie does not meet the definition of a qualified individual with a disability under the ADA.[19] The Code of Federal Regulations defines a reasonable accommodation under the ADA as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily per-

---

[19] For the purposes of this analysis, we assume without deciding that Mr. Preddie's health condition qualifies as a "disability" under the ADA.

formed, that enable an individual with a disability *who is qualified to perform the essential functions of that position*." 29 C.F.R. § 1630.2(o)(1)(ii) (emphasis added). The ADA defines a "qualified individual" with a disability as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In reviewing Mr. Preddie's ADA claims, the district court held that Mr. Preddie did not meet the definition of a qualified individual with a disability because his unplanned and sporadic attendance prevented him from performing the essential functions of his teaching position. We have held in the past that, in many instances, irregular attendance can prevent an individual from performing the essential functions of his or her job. *See Jovanovic*, 201 F.3d at 899–900 (holding that twenty-four absences in twelve months made it impossible for plaintiff to perform the essential functions of his job, thereby disqualifying him from the right to a reasonable accommodation under the ADA); *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1003 (7th Cir. 1998) (holding that "[a teacher] who does not come to work cannot perform the essential functions of his job"); *see also Waggoner v. Olin Corp.*, 169 F.3d 481, 484 (7th Cir. 1999) ("[I]n most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability.").

Here, it is reasonable to conclude that Mr. Preddie's twenty-three absences prevented him from performing the essential functions of his teaching position. Indeed, one of the reasons listed for the non-renewal of his contract was

that his "[a]ttendance [was] affecting student progress."[20] As such, we conclude that he is not a qualified individual with a disability under the ADA, and thus that he was not entitled to reasonable accommodation. This conclusion, combined with the fact that Mr. Preddie never requested such an accommodation in the first place, leads us to affirm the district court's grant of summary judgment to the BCSC on Mr. Preddie's ADA failure to accommodate claim.

### 2. Retaliation claim

Similarly, we affirm the district court's summary judgment ruling on Mr. Preddie's ADA retaliation claim. On this claim, Mr. Preddie argues that the BCSC unlawfully failed to renew his teaching contract because he exercised his rights under the ADA. Mr. Preddie can establish retaliation under the ADA through either the direct or indirect method of proof. *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). The direct method of proof for an ADA retaliation claim requires Mr. Preddie to show that: "(1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) [there is] a causal connection between the two." *Id.* (citing *Casna v. City of Loves Park*, 574 F.3d 420, 426 (7th Cir. 2009)). Under the indirect method, Mr. Preddie must demonstrate that (1) he "engaged in statutorily protected activity"; (2) he "was performing his job satisfactorily"; and (3) he "was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not

---

[20] R.50-9 at 2.

suffer." *Id.* at 601–02 (citing *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir. 2009)). Once Mr. Preddie has met this initial burden, the burden shifts to the BCSC "to present a non-invidious reason for the adverse employment action." *Id.* at 602. If the BCSC accomplishes this, then the burden shifts back to Mr. Preddie to demonstrate that the BCSC's explanation of the adverse employment action was pretextual. *Id.*

Here, Mr. Preddie does not make plain which method of proof he utilizes to make his ADA retaliation claim. Nevertheless, we conclude that Mr. Preddie's claim fails under either method. An element of both the indirect and direct methods of proof is that Mr. Preddie must have engaged in a statutorily protected activity—in other words, he must have asserted his rights under the ADA by either seeking an accommodation or raising a claim of discrimination due to his disability. *See, e.g.*, *id.* at 602 (where the protected activity at issue was "complaining about discriminatory acts and filing a discrimination charge"); *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008) (where protected activity was plaintiff's "requests for accommodations"). Our previous conclusion that the record does not reveal a request for accommodation, therefore, effectively dooms Mr. Preddie's retaliation claim. His periodic requests for his own health-related leave, which account for roughly one-third of his absences, without more, does not qualify as "protected activity" under the ADA. Thus, Mr. Preddie's claim fails under both the indirect and direct methods of proof, and we affirm the district court's judgment in favor of the BCSC on Mr. Preddie's ADA retaliation claim.

**B. Mr. Preddie's Title VII and Section 1981 claims**

In addition to his claims under the ADA, Mr. Preddie argues that the BCSC unlawfully discriminated against him because of his race. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). It is also unlawful for any individual—including an employer—to discriminate on the basis of race in the creation and enforcement of contracts. *See* 42 U.S.C § 1981. Plaintiffs may prove discrimination under Title VII and Section 1981 either directly or indirectly.[21]

Under the direct method, a plaintiff must show that his employer made an adverse employment decision "on an impermissible discriminatory basis." *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014). Here, Mr. Preddie offers no direct evidence that he was fired because of his race, and therefore must rely on the indirect method of proving racial discrimination. Under the indirect method of proof, a plaintiff meets his initial burden by showing that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he was subject to an adverse employment action; and (4) similarly situated employees

---

[21] The elements of proof under both Title VII and Section 1981 are "essentially identical," therefore we need not analyze them separately. *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1104 n.1 (7th Cir. 2012) (quoting *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010)).

who were not members of the protected class were treated more favorably. *Id.* (citing *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006)). If a plaintiff establishes a prima facie case of discrimination, only then must the employer "articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* Here, Mr. Preddie cannot meet his initial burden of proof on his Title VII and Section 1981 claims. Although it is true that Mr. Preddie, who is African-American, was subject to an adverse employment action in the non-renewal of his contract, Mr. Preddie does not succeed in proving that similarly situated employees were treated differently, nor does he show that he was meeting his employer's legitimate expectations.

Mr. Preddie argues that a number of white teachers routinely were granted medical-related leave, whereas Mr. Preddie's teaching contract was not renewed precisely because of his medical-related absences. Although Mr. Preddie does not specify, we assume that his reference to these other teachers is based on information contained in Dr. DeClue's deposition, in which Mr. Preddie's counsel recounted various requests for leave taken by white BCSC elementary school teachers from 2005–2013.[22] It is not clear from Dr. DeClue's deposition, however, whether the comparator teachers had similar performance records to Mr. Preddie. The record indicates that Mr. Preddie began experiencing performance-related issues as early as November 2010 and that these performance concerns continued into

---

[22] *See* R.50-3 at 11–12 (DeClue Dep. 41–49).

March 2011 when Dr. Clancy noted on Mr. Preddie's second-semester evaluation that he needed improvement in every category. Mr. Preddie's performance issues demonstrate not only that his purported comparator group is insufficient to bolster his racial discrimination claims, but also present a separate ground on which his Title VII and Section 1981 claims fail: Mr. Preddie was not meeting his employer's legitimate expectations. For these reasons, we find that Mr. Preddie has not established a prima facie case of discrimination under Title VII or Section 1981, and thus we affirm the district court's grant of summary judgment to the BCSC on these claims.

## C. Mr. Preddie's FMLA claims

### 1. Interference

Mr. Preddie also raises claims of interference and retaliation under the FMLA. Under the FMLA, it is "unlawful for [an] employer to interfere with, restrain, or deny" an employee's "exercise of or … attempt to exercise[] any right provided under" the Act. 29 U.S.C. § 2615(a)(1). To prevail on an FMLA-interference claim, a plaintiff must show that

> (1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied [or interfered with] … FMLA benefits to which he was entitled.

*Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 635–36 (7th Cir. 2009) (internal quotation marks omitted); *accord Pagel v. TIN Inc.*, 695 F.3d 622, 627 (7th Cir. 2012).

Two of these elements require closer examination on our part. We turn first to the notice requirement. We have observed that "[t]he notice requirements of the FMLA are not onerous. An employee need not expressly mention the FMLA in his leave request or otherwise invoke any of its provisions." *Burnett v. LFW Inc.*, 472 F.3d 471, 478 (7th Cir. 2006); *accord* 29 C.F.R. § 825.301(b) ("An employee … does not need to expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice … .").[23] "[I]t is sufficient notice if the employee provides the employer with enough information to put the employer on notice that FMLA-qualifying leave is needed." *Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 616 (7th Cir. 2001) (internal quotation marks omitted); *accord* 29 C.F.R. § 825.301(b).[24] Where "the need for leave concerns a family member rather than the employee [him]self, the employee should also indicate that leave is sought to care for that person." *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 826 (7th Cir. 2012) ("If Nicholson provided sufficient notice that

---

[23] *See also Price v. City of Fort Wayne*, 117 F.3d 1022, 1026 (7th Cir. 1997) ("The FMLA does not require that an employee give notice of a desire to invoke the FMLA.").

[24] *See also Aubuchon v. Knauf Fiberglass, GmbH*, 359 F.3d 950, 953 (7th Cir. 2004) ("[T]he employee's duty is merely to place the employer on notice of a probable basis for FMLA leave."); *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 382 (7th Cir. 2003) ("It is enough under the FMLA if the employer knows of the employee's need for leave … .").

she needed time off to care for her seriously ill parents, then Pulte had a duty to inquire further to confirm Nicholson's FMLA entitlement.").

Given this guidance, we must conclude that the evidence shows that, no later than November 2010, Mr. Preddie had placed the BCSC on notice of his need for leave for his son's sickle cell anemia. On October 31, 2010, Mr. Preddie notified Dr. Clancy, via email, that he was taking leave to care for his son who had just been hospitalized.[25] During the conversation, which occurred on the day of Mr. Preddie's return,[26] "the subject of [his] son's sickle cell anemia came up and was discussed."[27] According to Mr. Preddie, Dr. Clancy told him that he could not "'keep taking off time for [his] son'" and that he needed to find "'someone else [to] go pick him up'" when he gets sick.[28] Mr. Preddie followed up on this conversation with an email that informed Dr. Clancy of both the

---

[25] *See* R.30-10 at 2.

[26] Although Mr. Preddie could not recall the date of this conversation during his deposition, the evidence indicates that it occurred on November 3, 2010, the day he returned to work. *See* R.30-9 at 2 (Clancy affidavit describing conversation with Mr. Preddie on November 3, 2010); *see also* R.30-11 at 2 (email from Mr. Preddie to Dr. Clancy, dated November 3, 2010, referencing a conversation that occurred earlier that day concerning Mr. Preddie's recent absences to care for his son); R.50-4 at 1–2 (Employee Absence Report showing that Mr. Preddie was absent on November 1 and 2, 2010).

[27] R.30-9 at 2.

[28] R.50-2 at 7 (Preddie Dep. 40); *see also id.* at 5 (Preddie Dep. 36).

seriousness of his son's condition and the treatment it re-
quired.[29]

The same is true for Mr. Preddie's absences related to his
diabetes. In November 2010, Mr. Preddie's wife emailed
Dr. Clancy to inform her that Mr. Preddie had been hospital-
ized for an illness that was "affecting his diabetes in a bad
way."[30] Dr. Clancy thanked Mr. Preddie's wife for keeping
her informed and wished Mr. Preddie "a speedy recovery."[31]
The record, therefore, shows that Dr. Clancy was on notice
of the FMLA-qualifying reasons for Mr. Preddie's absences.[32]

---

[29] *See* R.30-11 at 2.

[30] R.30-13 at 2.

[31] *Id.*

[32] The BCSC maintains that

> [t]he fact that [it] may have known the reasons behind
> Mr. Preddie's absence from work does not satisfy
> Mr. Preddie's burden of showing that he provided sufficient
> notice of his intent to take leave under the FMLA where the
> undisputed evidence is that BCSC specifically advised him
> of the availability of FMLA leave and the name of the person
> that he needed to see to get an application for such leave and
> where Mr. Preddie failed to request such leave with full
> knowledge of the availability of that leave.

Appellee's Br. 13–14. We do not believe that the BCSC's argument finds
support in the governing regulation, which makes clear that an employ-
ee needs to provide "verbal notice sufficient to make the employer aware
that the employee needs FMLA-qualifying leave." 29 C.F.R. § 825.302(c).
The burden is then on the *employer* to "inquire further of the employee if
it is necessary to have more information about whether FMLA leave is
being sought by the employee[] and obtain the necessary details of the
leave to be taken." *Id.*

(continued…)

The "interference" element of Mr. Preddie's claim also requires some elaboration. The implementing regulations make clear that the ways in which an employer may inter-fere with FMLA benefits are not limited simply to the denial of leave. Interference also encompasses "us[ing] the taking of FMLA leave as a negative factor in employment actions" and "discouraging an employee from using such leave." 29 C.F.R. § 825.220(c),(b); *see also Pagel*, 695 F.3d at 631.

Here, there is evidence from which a jury could conclude that the BCSC "interfere[d]" with Mr. Preddie's rights by "us[ing] the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c). One of the stat-ed reasons for the non-renewal of Mr. Preddie's contract was his absences—almost all of which appear to be related to FMLA-qualifying conditions. Additionally, other reasons given for his dismissal are tied logically and practically to those absences.[33]

The record also contains evidence—namely Mr. Preddie's two conversations with Dr. Clancy concerning his son's sick-le cell anemia—from which a jury could conclude that the BCSC discouraged Mr. Preddie from incurring additional absences related to FMLA-qualifying conditions. In the first

---

(…continued)

The regulations do allow an employer to "require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave." *Id.* § 825.302(d). The BCSC, however, does not maintain that Mr. Preddie failed to comply with a notice re-quirement generally applicable to all leave.

[33] *See* R.50-9 at 2 (listing poor lesson plans for substitutes among the rea-sons for the non-renewal of his contract).

conversation, Dr. Clancy stated: "You've missed a lot of school for yourself. *You can't take off*. Is there anybody that can go pick up your son or anybody that can take care of your son … ?"[34] According to Mr. Preddie, in the second conversation, Dr. Clancy "said I can't miss time … for my son and that it's … affecting my classroom and I can't miss any more time to take off for my son."[35] We believe a jury reasonably could find that Dr. Clancy's discussions with Mr. Preddie were meant to convey the message that, if he missed additional time related to his son's condition, there would be adverse consequences.

There also is evidence in the record that Dr. Clancy's comments did have an effect on Mr. Preddie's decisions regarding leave. Mr. Preddie testified that "[t]he last time [Elliot] got sick," he called his wife to take care of his son because Mr. Preddie was afraid that "if I took off again … there would be repercussions."[36] Additionally, following Mr. Preddie's March conversation with Dr. Clancy, he did not miss any additional days related to his or Elliot's conditions. Based on this evidence, a jury could conclude that Mr. Preddie made the conscious decision not to take addi-

---

[34] R.50-2 at 5 (Preddie Dep. 36) (emphasis added).

[35] *Id.* at 9 (Preddie Dep. 42). Dr. Clancy did not make overt threats that additional absences would result in discipline or non-renewal of Mr. Preddie's contract; that, however, is not determinative. Rather, the critical question is whether the employer's actions would discourage a reasonable employee from taking FMLA leave. *Cf. Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009) (applying reasonable person standard in FMLA retaliation claim).

[36] R.30-1 at 6 (Preddie Dep. 46).

tional leave based on Dr. Clancy's implicit threats of adverse action.

We acknowledge that there is evidence in the record from which a jury could reach the contrary conclusion. At the summary judgment stage, however, "[i]t is not our role to evaluate the weight of the evidence, to judge the credibility of witnesses or to determine the ultimate truth of the matter, but simply to determine whether there exists a genuine issue of triable fact." *South v. Illinois Envtl. Prot. Agency*, 495 F.3d 747, 751 (7th Cir. 2007). Consequently, we must reverse the district court's judgment in favor of the BCSC on Mr. Preddie's FMLA-interference claim.

### 2. Retaliation

The FMLA also makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. 29 U.S.C. § 2615(a)(2). "To survive a motion for summary judgment on h[is] claim of retaliation under the FMLA, [Mr. Preddie] had to submit evidence showing that [the BCSC] demoted or fired h[im] because []he took valid leave." *Lucas v. Pyramax Bank, FSB*, 539 F.3d 661, 667 (7th Cir. 2008). Applying this standard, Mr. Preddie has raised a genuine issue of material fact that he suffered retaliation under the FMLA. Specifically, he has offered evidence that he was terminated, at least in part, based on his record of absences,[37] and that the BCSC knew that many of those absences were

---

[37] *See* R.50-9 at 2.

attributable to his diabetes and to his son's sickle cell ane-mia.[38] Under these circumstances, a reasonable jury could conclude that Mr. Preddie was terminated because he took leave for FMLA-qualifying conditions, and we must reverse the district court's summary judgment in the BCSC's favor.

We emphasize that, in reaching this conclusion, we have construed the facts in the light most favorable to Mr. Pred-die, as we must. We express no opinion as to the ultimate merits of Mr. Preddie's FMLA claims. We only conclude that he has raised a triable issue as to these claims.

### D. Mr. Preddie's Section 1986 claim

In the district court's summary judgment opinion, the court stated in a footnote, "Mr. Preddie's Complaint also mentions 42 U.S.C. § 1986; however, neither party addressed this statute in their briefing. Therefore, the Court finds that this claim has been abandoned and waived." *Preddie v. Bartholomew Cnty. Consol. Sch. Corp.*, 44 F. Supp. 3d 800, 804 n.1 (S.D. Ind. 2014). Mr. Preddie challenges this ruling on appeal, arguing that because the BCSC did not address his Section 1986 claim in its motion for summary judgment, he was not required to present any evidence relating to this claim in response to the BCSC's motion. Thus, he argues, the district court improperly treated his Section 1986 claim as aban-doned.

Mr. Preddie's complaint states the following:

---

[38] *See, e.g.*, R.30-1 at 11 (Preddie Dep. 65); R.30-10 at 2; R.50-2 at 5, 9 (Preddie Dep. 36, 42).

> This instant action is brought pursuant to Title
> VII of the Civil Rights Act of 1964, as amended,
> codified at 42 U.S.C. § 2000e *et seq.*, The Family
> Medical Leave Act ("FMLA") of 1993 as
> amended, codified at 29 U.S.C. § 2601 *et seq*[.];
> The Americans With Disabilities Act ("ADA"),
> as amended codified at 42 U.S.C. § 12101 *et seq.*,
> the Civil Rights Act of 1866, as amended, codi-
> fied at 42 U.S.C. § 1981 *et seq*[.], the Civil Rights
> Act of 1871, as amended, codified at 42 U.S.C.
> § 1983 and/or 1986 *et seq*[.], and the Civil Rights
> Act of 1991, as amended, codified at 42 U.S.C.
> § 1981(a), *et seq.*[39]

This is the only mention of Mr. Preddie's Section 1986 claim
in his complaint, although he does later reference his claim
under the Civil Rights Act of 1871.

Mr. Preddie is correct that the BCSC's motion for sum-
mary judgment does not address specifically his Section 1986
claim. Mr. Preddie's response to the BCSC's motion similarly
makes no reference to Section 1986, although no such refer-
ence was required of Mr. Preddie. The district court's charac-
terization of Mr. Preddie's Section 1986 claim as "aban-
doned" suggests that the onus was on Mr. Preddie to remind
the court, and the BCSC, of his claim under Section 1986 af-
ter the BCSC failed to mention it in its motion for summary
judgment. *Preddie*, 44 F. Supp. 3d at 804 n.1. This is incorrect.
*See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th
Cir. 2006) ("As a general matter, if the moving party does

---

[39] R.1-1 at 1–2.

not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision.").

Nevertheless, our conclusions on Mr. Preddie's discrimination claims necessarily prove fatal to any claim he attempted to make under Section 1986. Section 1986 of Title 42 states:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented … .

We find it difficult to see how this cause of action fits the facts of Mr. Preddie's case. Section 1985, which is referenced in the above excerpt, makes it unlawful to commit certain acts, such as conspiring to deprive a person or class of persons of the equal protection of the laws. 42 U.S.C. § 1985(3). Based on this reference, and the fact that Mr. Preddie's reference to Section 1986 was listed among his other civil rights claims, we suppose that Mr. Preddie could be arguing that the BCSC neglected to prevent individuals from discriminating against Mr. Preddie on the basis of his race (although this is a generous reading of such an underdeveloped argument). To the extent that this is the argument Mr. Preddie

sought to make, the district court more than addressed the issue when it ruled on Mr. Preddie's racial discrimination claims pursuant to Title VII, Section 1981, and Section 1983. In short, because the district court correctly found that the BCSC did not discriminate against Mr. Preddie based on his race, it would have been impossible to find that the BCSC neglected to prevent such discrimination in violation of Section 1986. Thus, affirming the district court's dismissal of this claim is proper. *See Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 538–39 (7th Cir. 2011) (holding that the district court's improper dismissal of a claim on a motion to dismiss was harmless when the claim had identical elements to another claim which was properly dismissed on summary judgment).

## E. BCSC's belated filing of its summary judgment motion

Finally, Mr. Preddie argues that the district court committed reversible error when it allowed the BCSC to file a belated motion for summary judgment. We review the district court's grant of the BCSC's request to file this motion for abuse of discretion. *Cf. Johnson v. Gudmundsson*, 35 F.3d 1104, 1111 (7th Cir. 1994) (noting that a district court was "well within the bounds of [its] discretion in denying [a party's] belated motion for leave to file … a memorandum in opposition to … summary judgment"). In this case, we conclude that the district court did not abuse its discretion.

When the BCSC filed its summary judgment motion one month after the deadline for dispositive motions, the district court issued an order to show cause why the late motion should not be stricken. After reviewing the BCSC's response

to this order, as well as the BCSC's own motion for leave to file a belated summary judgment motion, the district court granted the motion, concluding:

> The Court accepts that Counsel for the Defendant mistakenly believed that the dispositive motion deadline was September 18, 2013, rather than the original dispositive motion deadline of August 18, 2013. The Court finds that although the motion for summary judgment was filed late, it was filed in good faith, was not intentionally filed in violation of the dispositive motion deadline and the late filing constitutes excusable neglect.[40]

We do not see where the district court abused its discretion in ultimately considering the late motion. Rather than overlooking the fact that the BCSC filed a late motion, the district court quickly recognized the motion's tardiness and issued an order to show cause. Once cause for the late filing was shown to be an honest misunderstanding of the deadline for dispositive motions, the court allowed the late filing to stand. Thus, we affirm the district court's ruling.

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court with the exception of its judgment for the BCSC on Mr. Preddie's FMLA claims. With respect to those claims, we reverse the judgment of the district court and re-

---

[40] R.42 at 1.

mand for further proceedings consistent with this opinion. The parties shall bear their own costs in this appeal.

AFFIRMED in part; REVERSED and REMANDED in part