In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1403

YASAS RODRIGO,

*Plaintiff-Appellant,*

*v.*

CARLE FOUNDATION HOSPITAL d/b/a
CARLE FOUNDATION HOSPITAL &
FAMILY MEDICAL RESIDENCY, an
Illinois Corporation,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:14-cv-02274-HAB — **Harold A. Baker**, *Judge.*

ARGUED OCTOBER 24, 2017 — DECIDED JANUARY 2, 2018

Before EASTERBROOK, ROVNER, and HAMILTON, *Circuit Judges*.

ROVNER, *Circuit Judge.* Yasas Rodrigo sued his employer, Carle Foundation Hospital ("Carle"), for violations of the

Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.*
("Act"). The district court granted summary judgment in favor
of Carle on Rodrigo's claims for disability discrimination,
failure to provide a reasonable accommodation, and retalia-
tion. Rodrigo appeals and we affirm.

## I.

Rodrigo was a resident in Carle's Family Medicine Resi-
dency Program ("Program") beginning in July 2010. Medical
residency programs provide training to medical school
graduates who are seeking to become licensed physicians
certified in various specialties. Residents provide patient care
under the supervision of experienced doctors in settings such
as acute care hospitals like Carle. Unlike medical school, this
part of physician training includes an employment component.
The three-year Program at issue here was governed by annual
contracts between Carle and its residents and by policies
adopted by the hospital. The standard contract was designed
to be renewed each year as a resident completed the Program's
requirements. Residents were required to successfully com-
plete certain mandatory and elective rotations through various
medical specialties before proceeding from one Program year
to the next.

Residents were also required to pass the Step 3 test, the
third part of the United States Medical Licensing Examination
("USMLE") before advancing to the third year of the Program.
The Step 1 test and the two-part Step 2 test (encompassing
clinical knowledge and clinical skills) are usually completed in
medical school, prior to residency. Carle adopted a policy in
July 2012 that "[m]ore than two failures of USMLE Step

3 … will result in termination from the program." R. 18-23. Passing the Step 3 exam is a prerequisite for obtaining a license to practice medicine in the United States, and a license, in turn, is necessary to be eligible to take the Family Medicine board exam. Carle did not graduate residents from its Program unless they completed licensing requirements and were eligible to take the board exam. The State of Illinois (where Carle is located) has its own limits on licensure: a medical student with a total of five failures in the Step tests is not eligible for further testing or licensure in Illinois without significant remediation. *See* 68 Ill. Admin Code § 1285.60(a)(8) (setting forth the nine- to twelve-month remediation programs required by law).

Rodrigo failed his first attempt to pass Step 1 as well as his first attempt to pass Step 2 before successfully completing those tests. He followed this performance with difficulties in rotations during his first year in Carle's Program. In the fall of 2010, he was placed in remediation and directed to repeat two rotations. He completed remediation and was returned to good standing. Shortly thereafter, his performance in two other rotations was deemed insufficient and he was again placed in remediation. At that time, his supervisors at Carle considered whether a neuropsychological examination might help identify any physical or cognitive issues that were affecting his performance. Rodrigo never underwent the recommended testing, but he successfully completed the second round of remediation and returned again to good standing in the Program. Carle extended Rodrigo's first Program year by nearly five months to allow him to complete the first year requirements.

In May 2012, near the end of his second year in the Program, Rodrigo took the Step 3 test and failed. With only two months left before he was to begin the third year of the Program, Carle agreed to allow Rodrigo to extend his second Program year by twelve weeks in order to allow him to take the Step 3 test a second time. Around this same time, Carle adopted its policy limiting residents to three attempts at the Step 3 test. The policy requiring passage of Step 3 before advancing to the third Program year remained in effect.

In August 2012, Rodrigo reported to Carle that he had failed a second time. After the second failure, Rodrigo informed the director of the Program, Dr. Bharat Gopal, that he had a sleep disorder and that he had been diagnosed with Restless Leg Syndrome. Like most medical residents working long hours in stressful circumstances, he had complained of fatigue at various points in his residency but he had never previously reported having a diagnosed sleep disorder. He attributed his first two Step 3 failures to fatigue brought on by his sleep disorder and told Dr. Gopal that he had scheduled a third attempt. Although Rodrigo did not request an accommodation, Dr. Gopal suggested that he take a leave of absence to focus on passing Step 3. Dr. Gopal reminded Rodrigo that he would be terminated from the Program if he failed the test a third time. After initially rejecting the offer of a leave of absence, Rodrigo changed his mind and took three weeks off to prepare for his third attempt. His twelve-week extension for the second Program year ended on September 22, 2012. Soon thereafter, he took Step 3 for the third time. On October 29, 2012, he reported to Dr. Gopal that he had failed a third time.

In reporting his score to Dr. Gopal via email, Rodrigo remarked that, unlike his first two attempts at Step 3, he remained awake during the exam and simply felt fatigued. He wrote that he was "confident that an addition of a review course or another month off would not have changed [his] score." R. 18–26. He told Dr. Gopal that, "Test taking has always been an issue," and that it was an inherited trait in his family. He said, "The only regret I have it [sic] the fact that [I] didn't seek help early for my sleep until it was too late and this played the biggest role on my test score." He acknowledged that he "was not the easiest resident to understand from day one," but that he believed in retrospect that, "fair decision[s] [were] taken." R. 18–26.

After assuring Dr. Gopal that he was open to whatever decision Dr. Gopal made about his future, and acknowledging that termination of his residency was a "valid option," Rodrigo asked to be promoted to third-year status in the Program so that he could continue his residency and attempt to pass Step 3 in California in May 2013. Illinois, of course, was no longer an option because he had accumulated five total failures in the Step tests. He anticipated he would receive his score by June 2013 and conceded that "at that point, there will NOT be another option for me." He declined any scenario that would require him to repeat any additional months beyond July 2013, which would have been the natural end date for his three-year residency. R. 18–26.

Dr. Gopal informed Rodrigo that he was not eligible to continue in the Program. Rodrigo asked to resign from the Program in lieu of termination and Carle honored the request, announcing his resignation. Two days later, in a letter taking

a decidedly different tone, Rodrigo requested reinstatement so that he could finish his residency in Carle's Program by July 1, 2013. He asserted that he had been placed under tremendous stress "beyond whats [sic] expected from an ordinary resident physician." R. 18–30. He complained:

> During my time at Carle FP residency, I did not receive the appropriate intervention and adequate testing due to fear of confidentiality. As evident from the documentation, due to prior retaliation and prejudice, I was reluctant in seeking help. My severe insomnia was caused by the undue stress and embarrassment I was subjected to during my time at Carle. As a result, this has prevented my success in USMLE Step 3.

R. 18–30.

Carle declined the request for reinstatement and Rodrigo filed suit, asserting claims under the Americans With Disabilities Act. Specifically, he alleged that Carle failed to provide him a reasonable accommodation for his disability, discriminated against him on the basis of his disability by terminating him, and retaliated against him for engaging in protected activity. The district court granted summary judgment in favor of Carle on all of Rodrigo's claims. He appeals.

## II.

On appeal, Rodrigo argues that he produced sufficient evidence to overcome summary judgment on all three of his claims. In particular, he asserts that Carle discriminated against

him by terminating him when he failed to pass Step 3 within the allotted time frame. He contends that Carle allowed another Program participant to complete the Program without passing Step 3, and that he can therefore make out a *prima facie* case for discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[1] On the reasonable accommodation claim, he asserts that he presented evidence showing that he requested the accommodations of reinstatement to the Program, and the chance to take the Step 3 test a fourth time in California, among other things. He argues that Carle failed to respond to these requests with an interactive process to determine an appropriate accommodation. On the retaliation claim, he asserts that he presented evidence of protected activities including his request for a fourth attempt at the Step 3 test and his request for reinstatement. He claims that his termination and the refusal to reinstate him were in retaliation for engaging in these protected activities. Carle responds that Rodrigo is not protected by the Act because he is not a "qualified individual."

We review the district court's grant of summary judgment *de novo*, examining the record in the light most favorable to Rodrigo and construing all reasonable inferences from the evidence in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Yahnke v. Kane County, Ill.*, 823 F.3d 1066, 1070 (7th Cir. 2016). Summary judgment is appropriate when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

---

[1] That participant was not similarly situated because he completed the Program before Carle adopted its Step 3 policy. Therefore, we need not address this claim further.

The Act prohibits covered employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Act defines the term "qualified individual" as:

> an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8). Discrimination includes, among other things, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]" 42 U.S.C. § 12112(b)(5)(A).

Carle is correct that Rodrigo's claims for discrimination and failure to accommodate fail at the start because he cannot

demonstrate that he is a "qualified individual."[2] In determining whether an employee is a "qualified individual," we first consider whether the individual satisfies the prerequisites for the position and then turn to the question of whether the individual can perform the essential functions of the job with or without reasonable accommodation. *Stern v. St. Anthony's Health Center*, 788 F.3d 276, 285 (7th Cir. 2015); 42 U.S.C. § 12111(8). Prerequisites might include an appropriate educational background, employment experience, particular skills and licenses. *Stern*, 788 F.3d at 285; *Budde v. Kane County Forest Preserve*, 597 F.3d 860, 862 (7th Cir. 2010). *See also* 29 C.F.R. § 1630.2(m) ("The term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position."). Passing an exam required for licensure would fall into this category. *See, e.g., Leisen v. City of Shelbyville*, 153 F.3d 805, 808 (7th Cir. 1998) (fire department was entitled to require paramedic certification as a core qualification for the job of firefighter, and an employee who was unable to obtain certification within allotted time was not a "qualified individual" for the purposes of the Americans With Disabilities Act).

---

[2] Rodrigo was certainly a qualified individual in certain respects, and he successfully completed many of the requirements of the Program. When we say he was not a qualified individual, we mean that he was not qualified to advance to the third year of the Program and to continue in the Program because Carle had a legitimate requirement that residents pass Step 3 before progressing to the final Program year.

It is undisputed that in 2007, years before Rodrigo was admitted to the Program, Carle adopted a policy that required residents to pass Step 3 before they would be offered a contract for the third Program year. It is also undisputed that, in July 2012, Carle adopted a policy that "[m]ore than two failures of USMLE Step 3 … will result in termination from the program." R. 18–23. *See Leisen*, 153 F.3d at 808 ("[e]mployers are entitled to define the core qualifications for a position."). After the adoption of these policies, no resident who failed Step 3 more than two times was allowed to continue in the Program. On this record, there is simply no question that passing Step 3 was a legitimate requirement for advancing into the third Program year and completing the Program. And there is also no question that Rodrigo not only failed Step 3 three times but also disqualified himself from further testing or licensure in Illinois without significant remediation because he had accumulated five failures in the Step tests generally. Indeed, after his termination from Carle's Program, Rodrigo failed Step 3 two more times before passing on his sixth attempt in another state.

Rodrigo's arguments on appeal amount to an attempt to withdraw factual admissions he made below and an effort to recast his Step 3 failures as non-essential functions of his job as a resident. The attempt to withdraw prior admissions is so frivolous that we need not address it further. And even if we consider the requirement to pass Step 3 under the "essential functions" framework, his claims would still fail. In determining whether a particular duty is an essential function, we consider the employer's judgment, the employee's written job description, the amount of time the employee spends perform-

ing that function, the consequences of not requiring the employee to perform the function, and the experiences of past and current workers. *Stern*, 788 F.3d at 285; 29 C.F.R. § 1630.2(n)(3). Although the employer's judgment is considered an important factor, it is not determinative, and we also look to evidence of the employer's actual practices in the workplace. *Stern*, 788 F.3d at 285–86; *Miller v. Illinois Dept. of Transportation*, 643 F.3d 190, 198 (7th Cir. 2011).

Applying these factors, the undisputed evidence demonstrates that passing Step 3 is an "essential function" for a third-year medical resident at Carle. Carle, in its judgment as employer, considers passage of the test essential to the resident's medical training. Indeed, a resident who does not pass Step 3 is not eligible to become a licensed physician, and is not eligible to take the Family Medicine board exam, the goal of the residency Program. Carle includes the requirements for passing Step 3, including the time frame for passage and the maximum number of attempts, in its written policies. No other resident who failed Step 3 three times was allowed to continue in the Program after the hospital adopted its three-strikes policy. The consequence to Carle of the resident not passing is that the resident may not be eligible for licensing without significant remediation and will continue to practice on the licenses of supervising physicians, an obvious risk for the hospital. No matter how the requirement of passing Step 3 is framed, whether as a core qualification or as an essential function, the evidence supports only one conclusion: a resident who cannot pass the test in the requisite time frame is not a "qualified individual" for the third Program year.

We turn to the retaliation claim. The Act's retaliation provision is not limited to protecting *qualified* individuals:

> No person shall discriminate against *any* individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 122203(a) (emphasis added). *See also Morgan v. Joint Admin. Bd.*, 268 F.3d 456, 458–59 (7th Cir. 2001) (noting that the statutory protections against discrimination in the Americans With Disabilities Act are protections of "qualified individuals" with a disability, "but the retaliation provision protects individuals, period."). To succeed on a claim for retaliation, a plaintiff must demonstrate that she engaged in protected activity, that she suffered an adverse action, and that there is a causal connection between the two. *Preddie v. Bartholomew Consolidated School Corp.*, 799 F.3d 806, 814 (7th Cir. 2015). Protected activities include asserting one's rights under the Act either by seeking accommodation or by raising a claim of discrimination due to disability. *Preddie*, 799 F.3d at 814–15. Rodrigo asserts that his protected activities included his request for accommodation after his third failure of Step 3 and his appeal for reinstatement. He cites his termination and the denial of his request for reinstatement as adverse actions.

In asserting that Carle retaliated by refusing to waive its Step 3 passage requirement, Rodrigo is really alleging a discrimination or accommodation claim rather than a true

retaliation claim. In other words, Carle's alleged "retaliation" was simply an enforcement of its Step 3 policy, and the retaliation claim is thus a collateral attack on the legitimacy of that requirement. Rodrigo may not make an end-run around the "qualified individual" requirement by simply reframing a discrimination or accommodation claim as one for retaliation. Because he is not a qualified individual for the purposes of his discrimination and accommodation claims, he is not a qualified individual for his mislabeled retaliation claim. In any case, Rodrigo presented no evidence demonstrating that there was a causal connection between his asserted protected activity and either his termination or the refusal to reinstate him. *Preddie*, 799 F.3d at 814.

## III.

Carle provided to Rodrigo a number of accommodations during his residency including extensions of his first and second Program years, and time off to study for his third attempt at the Step 3 exam, an accommodation that he at first declined. Rodrigo himself admitted that the addition of a review course or another month off would not have helped him pass Step 3. In his deposition, he conceded that, other than giving him a leave of absence to study for the test (which the hospital did), there was nothing Carle could have done to help him pass the test after his second failure. It was after that second failure that Dr. Gopal learned for the first time that Rodrigo had a diagnosed sleep disorder. Rodrigo took the test three more times before eventually passing it. Allowing him the requested fourth attempt in California would not have helped. Carle was entitled to enforce its legitimate Step 3

policy, and so the court did not err in entering summary judgment in favor of Carle on all three of Rodrigo's claims under the Act.

AFFIRMED